(Slip Opinion) OCTOBER TERM, 2017 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## OIL STATES ENERGY SERVICES, LLC *v.* GREENE'S ENERGY GROUP, LLC, ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

No. 16–712.   Argued November 27, 2017—Decided April 24, 2018

Inter partes review authorizes the United States Patent and Trademark Office (PTO) to reconsider and cancel an already-issued patent claim in limited circumstances. See 35 U. S. C. §§311–319. Any person who is not the owner of the patent may petition for review. §311(a). If review is instituted, the process entitles the petitioner and the patent owner to conduct certain discovery, §316(a)(5); to file affidavits, declarations, and written memoranda, §316(a)(8); and to receive an oral hearing before the Patent Trial and Appeal Board, §316(a)(10). A final decision by the Board is subject to Federal Circuit review. §§318, 319.

Petitioner Oil States Energy Services, LLC, obtained a patent relating to technology for protecting wellhead equipment used in hydraulic fracturing. It sued respondent Greene's Energy Group, LLC, in Federal District Court for infringement. Greene's Energy challenged the patent's validity in the District Court and also petitioned the PTO for inter partes review. Both proceedings progressed in parallel. The District Court issued a claim-construction order favoring Oil States, while the Board issued a decision concluding that Oil States' claims were unpatentable. Oil States appealed to the Federal Circuit. In addition to its patentability arguments, it challenged the constitutionality of inter partes review, arguing that actions to revoke a patent must be tried in an Article III court before a jury. While the case was pending, the Federal Circuit issued a decision in a separate case, rejecting the same constitutional arguments raised by Oil States. The court then summarily affirmed the Board's decision in this case.

*Held*:

1. Inter partes review does not violate Article III.  Pp. 5–17.

(a) Under this Court's precedents, Congress has significant latitude to assign adjudication of public rights to entities other than Article III courts.  *Executive Benefits Ins. Agency* v. *Arkison*, 573 U. S. ___, ___.  Inter partes review falls squarely within the public-rights doctrine.  The decision to grant a patent is a matter involving public rights.  Inter partes review is simply a reconsideration of that grant, and Congress has permissibly reserved the PTO's authority to conduct that reconsideration.  Pp. 5–10.

(i) The grant of a patent falls within the public-rights doctrine.  *United States* v. *Duell*, 172 U. S. 576, 582–583.  Granting a patent involves a matter "arising between the government and others."  *Ex parte Bakelite Corp.*, 279 U. S. 438, 451.  Specifically, patents are "public franchises."  *Seymour* v. *Osborne*, 11 Wall. 516, 533.  Additionally, granting patents is one of "the constitutional functions" that can be carried out by "the executive or legislative departments" without "'judicial determination.'"  *Crowell* v. *Benson*, 285 U. S. 22, 50–51.  Pp. 7–8.

(ii) Inter partes review involves the same basic matter as the grant of a patent.  It is "a second look at an earlier . . . grant," *Cuozzo Speed Technologies, LLC* v. *Lee*, 579 U. S. ___, ___, and it involves the same interests as the original grant, see *Duell*, *supra,* at 586.  That inter partes review occurs after the patent has issued does not make a difference here.  Patents remain "subject to [the Board's] authority" to cancel outside of an Article III court, *Crowell, supra,* at 50, and this Court has recognized that franchises can be qualified in this manner, see, *e.g.*, *Louisville Bridge Co.* v. *United States*, 242 U. S. 409, 421.  Pp. 8–10.

(b) Three decisions that recognize patent rights as the "private property of the patentee," *United States* v. *American Bell Telephone Co.*, 128 U. S. 315, 370, do not contradict this conclusion.  See also *McCormick Harvesting Machine Co.* v. *Aultman*, 169 U. S. 606, 609; *Brown* v. *Duchesne*, 19 How. 183, 197.  Nor do they foreclose the kind of post-issuance administrative review that Congress has authorized here.  Those cases were decided under the Patent Act of 1870 and are best read as describing the statutory scheme that existed at that time.  Pp. 10–11.

(c) Although patent validity was often decided in 18th-century English courts of law, that history does not establish that inter partes review violates the "general" principle that "Congress may not 'withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law," *Stern* v. *Marshall*, 564 U. S. 462, 484.  Another means of canceling a patent at that time—a petition to the Privy Council to vacate a patent—closely re-

sembles inter partes review. The parties have cited nothing to suggest that the Framers were not aware of this common practice when writing the Patent Clause, or that they excluded the practice from the scope of the Clause. Relatedly, the fact that American courts have traditionally adjudicated patent validity in this country does not mean that they must forever do so. See *post*, at 8–10. Historical practice is not decisive here because matters governed by the public-rights doctrine may be assigned to the Legislature, the Executive, or the Judiciary. *Ex parte Bakelite Corp.*, *supra*, at 451. That Congress chose the courts in the past does not foreclose its choice of the PTO today. Pp. 12–15.

(d) Finally, the similarities between the various procedures used in inter partes review and procedures typically used in courts does not lead to the conclusion that inter partes review violates Article III. This Court has never adopted a "looks like" test to determine if an adjudication has improperly occurred outside an Article III court. See, *e.g.*, *Williams* v. *United States*, 289 U. S. 553, 563. Pp. 15–16.

(e) This holding is narrow. The Court addresses only the constitutionality of inter partes review and the precise constitutional challenges that Oil States raised here. The decision should not be misconstrued as suggesting that patents are not property for purposes of the Due Process Clause or the Takings Clause. Pp. 16–17.

2. Inter partes review does not violate the Seventh Amendment. When Congress properly assigns a matter to adjudication in a non-Article III tribunal, "the Seventh Amendment poses no independent bar to the adjudication of that action by a nonjury factfinder." *Granfinanciera, S. A.* v. *Nordberg*, 492 U. S. 33, 52–53. Thus, the rejection of Oil States' Article III challenge also resolves its Seventh Amendment challenge. P. 17.

639 Fed. Appx. 639, affirmed.

THOMAS, J., delivered the opinion of the Court, in which KENNEDY, GINSBURG, BREYER, ALITO, SOTOMAYOR, and KAGAN, JJ., joined. BREYER, J., filed a concurring opinion, in which GINSBURG and SOTOMAYOR, JJ., joined. GORSUCH, J., filed a dissenting opinion, in which ROBERTS, C. J., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 16–712

_____

## OIL STATES ENERGY SERVICES, LLC, PETITIONER _v._ GREENE'S ENERGY GROUP, LLC, ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

[April 24, 2018]

JUSTICE THOMAS delivered the opinion of the Court.

The Leahy-Smith America Invents Act, 35 U. S. C. §100 _et seq._, establishes a process called "inter partes review." Under that process, the United States Patent and Trademark Office (PTO) is authorized to reconsider and to cancel an issued patent claim in limited circumstances. In this case, we address whether inter partes review violates Article III or the Seventh Amendment of the Constitution. We hold that it violates neither.

## I

### A

Under the Patent Act, the PTO is "responsible for the granting and issuing of patents." 35 U. S. C. §2(a)(1). When an inventor applies for a patent, an examiner reviews the proposed claims and the prior art to determine if the claims meet the statutory requirements. See §§112, 131. Those requirements include utility, novelty, and nonobviousness based on the prior art. §§101, 102, 103. The Director of the PTO then approves or rejects the application. See §§131, 132(a). An applicant can seek judicial review of a final rejection. §§141(a), 145.

B

Over the last several decades, Congress has created administrative processes that authorize the PTO to reconsider and cancel patent claims that were wrongly issued. In 1980, Congress established "*ex parte* reexamination," which still exists today. See Act To Amend the Patent and Trademark Laws, 35 U. S. C. §301 *et seq. Ex parte* reexamination permits "[a]ny person at any time" to "file a request for reexamination." §302. If the Director determines that there is "a substantial new question of patentability" for "any claim of the patent," the PTO can reexamine the patent. §§303(a), 304. The reexamination process follows the same procedures as the initial examination. §305.

In 1999, Congress added a procedure called "inter partes reexamination." See American Inventors Protection Act, §§4601–4608, 113 Stat. 1501A–567 to 1501A–572. Under this procedure, any person could file a request for reexamination. 35 U. S. C. §311(a) (2006 ed.). The Director would determine if the request raised "a substantial new question of patentability affecting any claim of the patent" and, if so, commence a reexamination. §§312(a), 313 (2006 ed.). The reexamination would follow the general procedures for initial examination, but would allow the third-party requester and the patent owner to participate in a limited manner by filing responses and replies. §§314(a), (b) (2006 ed.). Inter partes reexamination was phased out when the America Invents Act went into effect in 2012. See §6, 125 Stat. 299–305.

C

The America Invents Act replaced inter partes reexamination with inter partes review, the procedure at issue here. See *id.,* at 299. Any person other than the patent owner can file a petition for inter partes review. 35 U. S. C. §311(a) (2012 ed.). The petition can request can-

cellation of "1 or more claims of a patent" on the grounds that the claim fails the novelty or nonobviousness standards for patentability. §311(b). The challenges must be made "only on the basis of prior art consisting of patents or printed publications." *Ibid.* If a petition is filed, the patent owner has the right to file a preliminary response explaining why inter partes review should not be instituted. §313.

Before he can institute inter partes review, the Director must determine "that there is a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged." §314(a). The decision whether to institute inter partes review is committed to the Director's discretion. See *Cuozzo Speed Technologies, LLC* v. *Lee*, 579 U. S. ___, ___ (2016) (slip op., at 9). The Director's decision is "final and nonappealable." §314(d).[1]

Once inter partes review is instituted, the Patent Trial and Appeal Board—an adjudicatory body within the PTO created to conduct inter partes review—examines the patent's validity. See 35 U. S. C. §§6, 316(c). The Board sits in three-member panels of administrative patent judges. See §6(c). During the inter partes review, the petitioner and the patent owner are entitled to certain discovery, §316(a)(5); to file affidavits, declarations, and written memoranda, §316(a)(8); and to receive an oral hearing before the Board, §316(a)(10). The petitioner has the burden of proving unpatentability by a preponderance of the evidence. §316(e). The owner can file a motion to amend the patent by voluntarily canceling a claim or by "propos[ing] a reasonable number of substitute claims." §316(d)(1)(B). The owner can also settle with the petitioner by filing a written agreement prior to the Board's final decision, which terminates the proceedings with respect to

_____

[1] The Director has delegated his authority to the Patent Trial and Appeal Board. See 37 CFR §42.108(c) (2017).

that petitioner. §317. If the settlement results in no petitioner remaining in the inter partes review, the Board can terminate the proceeding or issue a final written decision. §317(a).

If the proceeding does not terminate, the Board must issue a final written decision no later than a year after it notices the institution of inter partes review, but that deadline can be extended up to six months for good cause. §§316(a)(11), 318(a). If the Board's decision becomes final, the Director must "issue and publish a certificate." §318(b). The certificate cancels patent claims "finally determined to be unpatentable," confirms patent claims "determined to be patentable," and incorporates into the patent "any new or amended claim determined to be patentable." *Ibid.*

A party dissatisfied with the Board's decision can seek judicial review in the Court of Appeals for the Federal Circuit. §319. Any party to the inter partes review can be a party in the Federal Circuit. *Ibid.* The Director can intervene to defend the Board's decision, even if no party does. See §143; *Cuozzo*, *supra*, at ___ (slip op., at 15). When reviewing the Board's decision, the Federal Circuit assesses "the Board's compliance with governing legal standards de novo and its underlying factual determinations for substantial evidence." *Randall Mfg.* v. *Rea*, 733 F. 3d 1355, 1362 (CA Fed. 2013).

## II

Petitioner Oil States Energy Services, LLC, and respondent Greene's Energy Group, LLC, are both oilfield services companies. In 2001, Oil States obtained a patent relating to an apparatus and method for protecting wellhead equipment used in hydraulic fracturing. In 2012, Oil States sued Greene's Energy in Federal District Court for infringing that patent. Greene's Energy responded by challenging the patent's validity. Near the close of discov-

ery, Greene's Energy also petitioned the Board to institute inter partes review. It argued that two of the patent's claims were unpatentable because they were anticipated by prior art not mentioned by Oil States in its original patent application. Oil States filed a response opposing review. The Board found that Greene's Energy had established a reasonable likelihood that the two claims were unpatentable and, thus, instituted inter partes review.

The proceedings before the District Court and the Board progressed in parallel. In June 2014, the District Court issued a claim-construction order. The order construed the challenged claims in a way that foreclosed Greene's Energy's arguments about the prior art. But a few months later, the Board issued a final written decision concluding that the claims were unpatentable. The Board acknowledged the District Court's contrary decision, but nonetheless concluded that the claims were anticipated by the prior art.

Oil States sought review in the Federal Circuit. In addition to its arguments about patentability, Oil States challenged the constitutionality of inter partes review. Specifically, it argued that actions to revoke a patent must be tried in an Article III court before a jury. While Oil States' case was pending, the Federal Circuit issued an opinion in a different case, rejecting the same constitutional arguments. *MCM Portfolio LLC* v. *Hewlett-Packard Co.*, 812 F. 3d 1284, 1288–1293 (2015). The Federal Circuit summarily affirmed the Board's decision in this case. 639 Fed. Appx. 639 (2016).

We granted certiorari to determine whether inter partes review violates Article III or the Seventh Amendment. 582 U. S. \_\_\_ (2017). We address each issue in turn.

## III

Article III vests the judicial power of the United States "in one supreme Court, and in such inferior Courts as the

Congress may from time to time ordain and establish." §1. Consequently, Congress cannot "confer the Government's 'judicial Power' on entities outside Article III." *Stern* v. *Marshall*, 564 U. S. 462, 484 (2011). When determining whether a proceeding involves an exercise of Article III judicial power, this Court's precedents have distinguished between "public rights" and "private rights." *Executive Benefits Ins. Agency* v. *Arkison*, 573 U. S. ___, ___ (2014) (slip op., at 6) (internal quotation marks omitted). Those precedents have given Congress significant latitude to assign adjudication of public rights to entities other than Article III courts. See *ibid.*; *Stern*, *supra*, at 488–492.

This Court has not "definitively explained" the distinction between public and private rights, *Northern Pipeline Constr. Co.* v. *Marathon Pipe Line Co.*, 458 U. S. 50, 69 (1982), and its precedents applying the public-rights doctrine have "not been entirely consistent," *Stern*, 564 U. S., at 488. But this case does not require us to add to the "various formulations" of the public-rights doctrine. *Ibid.* Our precedents have recognized that the doctrine covers matters "which arise between the Government and persons subject to its authority in connection with the performance of the constitutional functions of the executive or legislative departments." *Crowell* v. *Benson*, 285 U. S. 22, 50 (1932). In other words, the public-rights doctrine applies to matters "'arising between the government and others, which from their nature do not require judicial determination and yet are susceptible of it.'" *Ibid.* (quoting *Ex parte Bakelite Corp.*, 279 U. S. 438, 451 (1929)). Inter partes review involves one such matter: reconsideration of the Government's decision to grant a public franchise.

## A

Inter partes review falls squarely within the public-rights doctrine. This Court has recognized, and the par-

ties do not dispute, that the decision to *grant* a patent is a matter involving public rights—specifically, the grant of a public franchise. Inter partes review is simply a reconsideration of that grant, and Congress has permissibly reserved the PTO's authority to conduct that reconsideration. Thus, the PTO can do so without violating Article III.

1

This Court has long recognized that the grant of a patent is a "'matte[r] involving public rights.'" *United States* v. *Duell*, 172 U. S. 576, 582–583 (1899) (quoting *Murray's Lessee* v. *Hoboken Land & Improvement Co.*, 18 How. 272, 284 (1856)). It has the key features to fall within this Court's longstanding formulation of the public-rights doctrine.

*Ab initio*, the grant of a patent involves a matter "arising between the government and others." *Ex parte Bakelite Corp.*, *supra*, at 451. As this Court has long recognized, the grant of a patent is a matter between "'the public, who are the grantors, and . . . the patentee.'" *Duell*, *supra,* at 586 (quoting *Butterworth* v. *United States ex rel. Hoe*, 112 U. S. 50, 59 (1884)). By "issuing patents," the PTO "take[s] from the public rights of immense value, and bestow[s] them upon the patentee." *United States* v. *American Bell Telephone Co.*, 128 U. S. 315, 370 (1888). Specifically, patents are "public franchises" that the Government grants "to the inventors of new and useful improvements." *Seymour* v. *Osborne*, 11 Wall. 516, 533 (1871); accord, *Pfaff* v. *Wells Electronics, Inc.*, 525 U. S. 55, 63–64 (1998). The franchise gives the patent owner "the right to exclude others from making, using, offering for sale, or selling the invention throughout the United States." 35 U. S. C. §154(a)(1). That right "did not exist at common law." *Gayler* v. *Wilder*, 10 How. 477, 494 (1851). Rather, it is a "creature of statute law." *Crown*

*Die & Tool Co.* v. *Nye Tool & Machine Works*, 261 U. S. 24, 40 (1923).

Additionally, granting patents is one of "the constitutional functions" that can be carried out by "the executive or legislative departments" without " 'judicial determination.'" *Crowell*, *supra*, at 50–51 (quoting *Ex parte Bakelite Corp.*, *supra*, at 452). Article I gives Congress the power "[t]o promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." §8, cl. 8. Congress can grant patents itself by statute. See, *e.g., Bloomer* v. *McQuewan*, 14 How. 539, 548–550 (1853). And, from the founding to today, Congress has authorized the Executive Branch to grant patents that meet the statutory requirements for patentability. See 35 U. S. C. §§2(a)(1), 151; see also Act of July 8, 1870, §31, 16 Stat. 202; Act of July 4, 1836, §7, 5 Stat. 119–120; Act of Apr. 10, 1790, ch. 7, §1, 1 Stat. 109–110. When the PTO "adjudicate[s] the patentability of inventions," it is "exercising the executive power." *Freytag* v. *Commissioner*, 501 U. S. 868, 910 (1991) (Scalia, J., concurring in part and concurring in judgment) (emphasis deleted).

Accordingly, the determination to grant a patent is a "matte[r] involving public rights." *Murray's Lessee*, *supra*, at 284. It need not be adjudicated in Article III court.

2

Inter partes review involves the same basic matter as the grant of a patent. So it, too, falls on the public-rights side of the line.

Inter partes review is "a second look at an earlier administrative grant of a patent." *Cuozzo*, 579 U. S., at ___ (slip op., at 16). The Board considers the same statutory requirements that the PTO considered when granting the patent. See 35 U. S. C. §311(b). Those statutory requirements prevent the "issuance of patents whose effects are

to remove existent knowledge from the public domain." *Graham* v. *John Deere Co. of Kansas City*, 383 U. S. 1, 6 (1966). So, like the PTO's initial review, the Board's inter partes review protects "the public's paramount interest in seeing that patent monopolies are kept within their legitimate scope," *Cuozzo*, *supra*, at \_\_\_ (slip op., at 16) (internal quotation marks and alterations omitted). Thus, inter partes review involves the same interests as the determination to grant a patent in the first instance. See *Duell*, *supra*, at 586.

The primary distinction between inter partes review and the initial grant of a patent is that inter partes review occurs *after* the patent has issued. But that distinction does not make a difference here. Patent claims are granted subject to the qualification that the PTO has "the authority to reexamine—and perhaps cancel—a patent claim" in an inter partes review. See *Cuozzo*, *supra*, at \_\_\_ (slip op., at 3). Patents thus remain "subject to [the Board's] authority" to cancel outside of an Article III court. *Crowell*, 285 U. S., at 50.

This Court has recognized that franchises can be qualified in this manner. For example, Congress can grant a franchise that permits a company to erect a toll bridge, but qualify the grant by reserving its authority to revoke or amend the franchise. See, *e.g., Louisville Bridge Co.* v. *United States*, 242 U. S. 409, 421 (1917) (collecting cases). Even after the bridge is built, the Government can exercise its reserved authority through legislation or an administrative proceeding. See, *e.g., id.,* at 420–421; *Hannibal Bridge Co.* v. *United States*, 221 U. S. 194, 205 (1911); *Bridge Co.* v. *United States*, 105 U. S. 470, 478–482 (1882). The same is true for franchises that permit companies to build railroads or telegraph lines. See, *e.g., United States* v. *Union Pacific R. Co.*, 160 U. S. 1, 24–25, 37–38 (1895).

Thus, the public-rights doctrine covers the matter resolved in inter partes review. The Constitution does not

prohibit the Board from resolving it outside of an Article
III court.

## B

Oil States challenges this conclusion, citing three deci-
sions that recognize patent rights as the "private property
of the patentee." *American Bell Telephone Co.*, 128 U. S.,
at 370; see also *McCormick Harvesting Machine Co.* v.
*Aultman*, 169 U. S. 606, 609 (1898) ("[A granted patent]
has become the property of the patentee"); *Brown* v. *Du-
chesne*, 19 How. 183, 197 (1857) ("[T]he rights of a party
under a patent are his private property"). But those cases
do not contradict our conclusion.

Patents convey only a specific form of property right—a
public franchise. See *Pfaff*, 525 U. S., at 63–64. And
patents are "entitled to protection as any other property,
*consisting of a franchise.*" *Seymour*, 11 Wall. at 533 (em-
phasis added). As a public franchise, a patent can confer
only the rights that "the statute prescribes." *Gayler*,
*supra*, at 494; *Wheaton* v. *Peters*, 8 Pet. 591, 663–664
(1834) (noting that Congress has "the power to prescribe
the conditions on which such right shall be enjoyed"). It is
noteworthy that one of the precedents cited by Oil States
acknowledges that the patentee's rights are "derived
altogether" from statutes, "are to be regulated and meas-
ured by these laws, and cannot go beyond them." *Brown*,
*supra*, at 195.[2]

One such regulation is inter partes review. See *Cuozzo*,

_____

[2] This Court has also recognized this dynamic for state-issued fran-
chises. For instance, States often reserve the right to alter or revoke a
corporate charter either "in the act of incorporation or in some general
law of the State which was in operation at the time the charter was
granted." *Pennsylvania College Cases*, 13 Wall. 190, 214, and n. †
(1872). That reservation remains effective even after the corporation
comes into existence, and such alterations do not offend the Contracts
Clause of Article I, §10. See *Pennsylvania College Cases*, *supra*, at 212–
214; *e.g., Miller* v. *State*, 15 Wall. 478, 488–489 (1873).

579 U. S., at \_\_\_ (slip op., at 3). The Patent Act provides that, "[s]ubject to the provisions of this title, patents shall have the attributes of personal property." 35 U. S. C. §261. This provision qualifies any property rights that a patent owner has in an issued patent, subjecting them to the express provisions of the Patent Act. See *eBay Inc.* v. *MercExchange, L. L. C.*, 547 U. S. 388, 392 (2006). Those provisions include inter partes review. See §§311–319.

Nor do the precedents that Oil States cites foreclose the kind of post-issuance administrative review that Congress has authorized here. To be sure, two of the cases make broad declarations that "[t]he only authority competent to set a patent aside, or to annul it, or to correct it for any reason whatever, is vested in the courts of the United States, and not in the department which issued the patent." *McCormick Harvesting Machine Co.*, *supra*, at 609; accord, *American Bell Telephone Co.*, 128 U. S., at 364. But those cases were decided under the Patent Act of 1870. See *id.*, at 371; *McCormick Harvesting Machine Co.*, *supra*, at 611. That version of the Patent Act did not include any provision for post-issuance administrative review. Those precedents, then, are best read as a description of the statutory scheme that existed at that time. They do not resolve Congress' authority under the Constitution to establish a different scheme.[3]

––––––––––

[3] The dissent points to *McCormick*'s statement that the Patent Office Commissioner could not invalidate the patent at issue because it would "'deprive the applicant of his property without due process of law, and would be in fact an invasion of the judicial branch.'" *Post,* at 10 (quoting *McCormick Harvesting Machine Co.* v. *Aultman*, 169 U. S. 606, 612 (1898)). But that statement followed naturally from the Court's determination that, under the Patent Act of 1870, the Commissioner "was *functus officio*" and "had no power to revoke, cancel, or annul" the patent at issue. 169 U. S., at 611–612.

Nor is it significant that the *McCormick* Court "equated invention patents with land patents." *Post,* at 10. *McCormick* itself makes clear that the analogy between the two depended on the particulars of the

C

Oil States and the dissent contend that inter partes review violates the "general" principle that "Congress may not 'withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty.'" *Stern*, 564 U. S., at 484 (quoting *Murray's Lessee*, 18 How., at 284). They argue that this is so because patent validity was often decided in English courts of law in the 18th century. For example, if a patent owner brought an infringement action, the defendant could challenge the validity of the patent as an affirmative defense. See Lemley, Why Do Juries Decide If Patents Are Valid? 99 Va. L. Rev. 1673, 1682, 1685–1686, and n. 52 (2013). Or, an individual could challenge the validity of a patent by filing a writ of *scire facias* in the Court of Chancery, which would sit as a law court when adjudicating the writ. See *id.,* at 1683–1685, and n. 44; Bottomley, Patent Cases in the Court of Chancery, 1714–58, 35 J. Legal Hist. 27, 36–37, 41–43 (2014).

But this history does not establish that patent validity is a matter that, "from its nature," must be decided by a court. *Stern*, *supra*, at 484 (quoting *Murray's Lessee*, *supra*, at 284). The aforementioned proceedings were between private parties. But there was another means of

---

Patent Act of 1870. See 169 U. S., at 609–610. Modern invention patents, by contrast, are meaningfully different from land patents. The land-patent cases invoked by the dissent involved a "transaction [in which] 'all authority or control' over the lands has passed from 'the Executive Department.'" *Boesche* v. *Udall*, 373 U. S. 472, 477 (1963) (quoting *Moore* v. *Robbins*, 96 U. S. 530, 533 (1878)). Their holdings do not apply when "the Government continues to possess some measure of control over" the right in question. *Boesche*, 373 U. S., at 477; see *id.,* at 477–478 (affirming administrative cancellations of public-land leases). And that is true of modern invention patents under the current Patent Act, which gives the PTO continuing authority to review and potentially cancel patents after they are issued. See 35 U. S. C. §§261, 311–319.

canceling a patent in 18th-century England, which more closely resembles inter partes review: a petition to the Privy Council to vacate a patent. See Lemley, *supra,* at 1681–1682; Hulme, Privy Council Law and Practice of Letters Patent for Invention From the Restoration to 1794, 33 L. Q. Rev. 63 (1917). The Privy Council was composed of the Crown's advisers. Lemley, *supra,* at 1681. From the 17th through the 20th centuries, English patents had a standard revocation clause that permitted six or more Privy Counsellors to declare a patent void if they determined the invention was contrary to law, "prejudicial" or "inconvenient," not new, or not invented by the patent owner. See 11 W. Holdsworth, A History of English Law 426–427, and n. 6 (1938); Davies, The Early History of the Patent Specification, 50 L. Q. Rev. 86, 102–106 (1934). Individuals could petition the Council to revoke a patent, and the petition was referred to the Attorney General. The Attorney General examined the petition, considered affidavits from the petitioner and patent owner, and heard from counsel. See, *e.g., Bull* v. *Lydall*, PC2/81, pp. 180– 181 (1706). Depending on the Attorney General's conclusion, the Council would either void the patent or dismiss the petition. See, *e.g., Darby* v. *Betton*, PC2/99, pp. 358– 359 (1745–1746) (voiding the patent); *Baker* v. *James*, PC2/103, pp. 320–321, 346–347 (1752) (dismissing the petition).

  The Privy Council was a prominent feature of the English system. It had exclusive authority to revoke patents until 1753, and after that, it had concurrent jurisdiction with the courts. See Hulme, 33 L. Q. Rev., at 189–191, 193–194. The Privy Council continued to consider revocation claims and to revoke patents throughout the 18th century. Its last revocation was in 1779. See *id.,* at 192– 193. It considered, but did not act on, revocation claims in 1782, 1794, and 1810. See *ibid.*; *Board of Ordinance* v. *Parr*, PC1/3919 (1810).

The Patent Clause in our Constitution "was written against the backdrop" of the English system. *Graham*, 383 U. S., at 5. Based on the practice of the Privy Council, it was well understood at the founding that a patent system could include a practice of granting patents subject to potential cancellation in the executive proceeding of the Privy Council. The parties have cited nothing in the text or history of the Patent Clause or Article III to suggest that the Framers were not aware of this common practice. Nor is there any reason to think they excluded this practice during their deliberations. And this Court has recognized that, "[w]ithin the scope established by the Constitution, Congress may set out conditions and tests for patentability." *Id.*, at 6. We conclude that inter partes review is one of those conditions.[4]

For similar reasons, we disagree with the dissent's assumption that, because courts have traditionally adjudicated patent validity in this country, courts must forever continue to do so. See *post,* at 8–10. Historical practice is not decisive here because matters governed by the public-rights doctrine "from their nature" can be resolved in multiple ways: Congress can "reserve to itself the power to

---

[4] Oil States also suggests that inter partes review could be an unconstitutional condition because it conditions the benefit of a patent on accepting the possibility of inter partes review. Cf. *Koontz* v. *St. Johns River Water Management Dist.*, 570 U. S. 595, 604 (2013) ("[T]he government may not deny a benefit to a person because he exercises a constitutional right" (internal quotation marks omitted)). Even assuming a patent is a "benefit" for purposes of the unconstitutional-conditions doctrine, that doctrine does not apply here. The doctrine prevents the Government from using conditions "to produce a result which it could not command directly." *Perry* v. *Sindermann*, 408 U. S. 593, 597 (1972) (internal quotation marks and alterations omitted). But inter partes review is consistent with Article III, see Part III–A, *supra*, and falls within Congress' Article I authority, see Part III–C, *supra*, so it is something Congress can "command directly," *Perry*, *supra*, at 597.

decide," "delegate that power to executive officers," or "commit it to judicial tribunals." *Ex parte Bakelite Corp.*, 279 U. S., at 451. That Congress chose the courts in the past does not foreclose its choice of the PTO today.

## D

Finally, Oil States argues that inter partes review violates Article III because it shares "every salient characteristic associated with the exercise of the judicial power." Brief for Petitioner 20. Oil States highlights various procedures used in inter partes review: motion practice before the Board; discovery, depositions, and cross-examination of witnesses; introduction of evidence and objections based on the Federal Rules of Evidence; and an adversarial hearing before the Board. See 35 U. S. C. §316(a); 77 Fed. Reg. 48758, 48761–48763 (2012). Similarly, Oil States cites PTO regulations that use terms typically associated with courts—calling the hearing a "trial," *id.,* at 48758; the Board members "judges," *id.,* at 48763; and the Board's final decision a "judgment," *id.,* at 48761, 48766–48767.

But this Court has never adopted a "looks like" test to determine if an adjudication has improperly occurred outside of an Article III court. The fact that an agency uses court-like procedures does not necessarily mean it is exercising the judicial power. See *Freytag*, 501 U. S., at 910 (opinion of Scalia, J.). This Court has rejected the notion that a tribunal exercises Article III judicial power simply because it is "called a court and its decisions called judgments." *Williams* v. *United States*, 289 U. S. 553, 563 (1933). Nor does the fact that an administrative adjudication is final and binding on an individual who acquiesces in the result necessarily make it an exercise of the judicial power. See, *e.g., Murray's Lessee*, 18 How., at 280–281 (permitting the Treasury Department to conduct "final and binding" audits outside of an Article III court). Al-

though inter partes review includes some of the features of adversarial litigation, it does not make any binding determination regarding "the liability of [Greene's Energy] to [Oil States] under the law as defined." *Crowell*, 285 U. S., at 51. It remains a matter involving public rights, one "between the government and others, which from [its] nature do[es] not require judicial determination." *Ex parte Bakelite Corp.*, 279 U. S., at 451.[5]

E

We emphasize the narrowness of our holding. We address the constitutionality of inter partes review only. We do not address whether other patent matters, such as infringement actions, can be heard in a non-Article III forum. And because the Patent Act provides for judicial review by the Federal Circuit, see 35 U. S. C. §319, we need not consider whether inter partes review would be constitutional "without any sort of intervention by a court at any stage of the proceedings," *Atlas Roofing Co.* v. *Occupational Safety and Health Review Comm'n*, 430 U. S. 442, 455, n. 13 (1977). Moreover, we address only the precise constitutional challenges that Oil States raised

_____

[5] Oil States also points out that inter partes review "is initiated by private parties and implicates no waiver of sovereign immunity." Brief for Petitioner 30–31. But neither of those features takes inter partes review outside of the public-rights doctrine. That much is clear from *United States* v. *Duell*, 172 U. S. 576 (1899), which held that the doctrine covers interference proceedings—a procedure to "determin[e] which of two claimants is entitled to a patent"—even though interference proceedings were initiated by "'private interests compet[ing] for preference'" and did not involve a waiver of sovereign immunity. *Id.*, at 582, 586 (quoting *Butterworth* v. *United States ex rel. Hoe*, 112 U. S. 50, 59 (1884)). Also, inter partes review is not initiated by private parties in the way that a common-law cause of action is. To be sure, a private party files the petition for review. 35 U. S. C. §311(a). But the decision to institute review is made by the Director and committed to his unreviewable discretion. See *Cuozzo Speed Technologies, LLC* v. *Lee*, 579 U. S. ___, ___ (2016) (slip op., at 9).

here. Oil States does not challenge the retroactive application of inter partes review, even though that procedure was not in place when its patent issued. Nor has Oil States raised a due process challenge. Finally, our decision should not be misconstrued as suggesting that patents are not property for purposes of the Due Process Clause or the Takings Clause. See, *e.g., Florida Prepaid Postsecondary Ed. Expense Bd.* v. *College Savings Bank*, 527 U. S. 627, 642 (1999); *James* v. *Campbell*, 104 U. S. 356, 358 (1882).

## IV

In addition to Article III, Oil States challenges inter partes review under the Seventh Amendment. The Seventh Amendment preserves the "right of trial by jury" in "Suits at common law, where the value in controversy shall exceed twenty dollars." This Court's precedents establish that, when Congress properly assigns a matter to adjudication in a non-Article III tribunal, "the Seventh Amendment poses no independent bar to the adjudication of that action by a nonjury factfinder." *Granfinanciera, S. A.* v. *Nordberg*, 492 U. S. 33, 53–54 (1989); accord, *Atlas Roofing Co.*, *supra*, at 450–455. No party challenges or attempts to distinguish those precedents. Thus, our rejection of Oil States' Article III challenge also resolves its Seventh Amendment challenge. Because inter partes review is a matter that Congress can properly assign to the PTO, a jury is not necessary in these proceedings.

## V

Because inter partes review does not violate Article III or the Seventh Amendment, we affirm the judgment of the Court of Appeals.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 16–712

_____

## OIL STATES ENERGY SERVICES, LLC, PETITIONER *v.* GREENE'S ENERGY GROUP, LLC, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

[April 24, 2018]

JUSTICE BREYER, with whom JUSTICE GINSBURG and JUSTICE SOTOMAYOR join, concurring.

I join the Court's opinion in full. The conclusion that inter partes review is a matter involving public rights is sufficient to show that it violates neither Article III nor the Seventh Amendment. But the Court's opinion should not be read to say that matters involving private rights may never be adjudicated other than by Article III courts, say, sometimes by agencies. Our precedent is to the contrary. *Stern* v. *Marshall*, 564 U. S. 462, 494 (2011); *Commodity Futures Trading Comm'n* v. *Schor*, 478 U. S. 833, 853–856 (1986); see also *Stern, supra*, at 513 (BREYER, J., dissenting) ("The presence of 'private rights' does not automatically determine the outcome of the question but requires a more 'searching' examination of the relevant factors").

# SUPREME COURT OF THE UNITED STATES

_____

No. 16–712

_____

## OIL STATES ENERGY SERVICES, LLC, PETITIONER *v.* GREENE'S ENERGY GROUP, LLC, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FEDERAL CIRCUIT

[April 24, 2018]

JUSTICE GORSUCH, with whom THE CHIEF JUSTICE joins, dissenting.

After much hard work and no little investment you devise something you think truly novel. Then you endure the further cost and effort of applying for a patent, devoting maybe $30,000 and two years to that process alone. At the end of it all, the Patent Office agrees your invention is novel and issues a patent. The patent affords you exclusive rights to the fruits of your labor for two decades. But what happens if someone later emerges from the woodwork, arguing that it was all a mistake and your patent should be canceled? Can a political appointee and his administrative agents, instead of an independent judge, resolve the dispute? The Court says yes. Respectfully, I disagree.

We sometimes take it for granted today that independent judges will hear our cases and controversies. But it wasn't always so. Before the Revolution, colonial judges depended on the crown for their tenure and salary and often enough their decisions followed their interests. The problem was so serious that the founders cited it in their Declaration of Independence (see ¶11). Once free, the framers went to great lengths to guarantee a degree of judicial independence for future generations that they themselves had not experienced. Under the Constitution,

judges "hold their Offices during good Behaviour" and
their "Compensation . . . shall not be diminished during
the[ir] Continuance in Office." Art. III, §1. The framers
knew that "a fixed provision" for judges' financial support
would help secure "the independence of the judges," be-
cause "a power over a man's subsistence amounts to a
power over his will." The Federalist No. 79, p. 472 (C.
Rossiter ed. 1961) (A. Hamilton) (emphasis deleted). They
were convinced, too, that "[p]eriodical appointments,
however regulated, or by whomsoever made, would, in
some way or other, be fatal to [the courts'] necessary inde-
pendence." The Federalist No. 78, at 471 (A. Hamilton).

Today, the government invites us to retreat from the
promise of judicial independence. Until recently, most
everyone considered an issued patent a personal right—no
less than a home or farm—that the federal government
could revoke only with the concurrence of independent
judges. But in the statute before us Congress has tapped
an executive agency, the Patent Trial and Appeal Board,
for the job. Supporters say this is a good thing because
the Patent Office issues too many low quality patents;
allowing a subdivision of that office to clean up problems
after the fact, they assure us, promises an efficient solu-
tion. And, no doubt, dispensing with constitutionally
prescribed procedures is often expedient. Whether it is
the guarantee of a warrant before a search, a jury trial
before a conviction—or, yes, a judicial hearing before a
property interest is stripped away—the Constitution's
constraints can slow things down. But economy supplies
no license for ignoring these—often vitally inefficient—
protections. The Constitution "reflects a judgment by the
American people that the benefits of its restrictions on the
Government outweigh the costs," and it is not our place to
replace that judgment with our own. *United States* v.
*Stevens*, 559 U. S. 460, 470 (2010).

Consider just how efficient the statute before us is. The

Director of the Patent Office is a political appointee who serves at the pleasure of the President. 35 U. S. C. §§3(a)(1), (a)(4). He supervises and pays the Board members responsible for deciding patent disputes. §§1(a), 3(b)(6), 6(a). The Director is allowed to select which of these members, and how many of them, will hear any particular patent challenge. See §6(c). If they (somehow) reach a result he does not like, the Director can add more members to the panel—including himself—and order the case reheard. See §§6(a), (c); *In re Alappat*, 33 F. 3d 1526, 1535 (CA Fed. 1994) (en banc); *Nidec Motor Corp.* v. *Zhongshan Broad Ocean Motor Co. Ltd.*, 868 F. 3d 1013, 1020 (CA Fed. 2013) (Dyk, J., concurring), cert. pending, No. 17–751. Nor has the Director proven bashful about asserting these statutory powers to secure the "'policy judgments'" he seeks. Brief for Petitioner 46 (quoting Patent Office Solicitor); see also Brief for Shire Pharmaceuticals LLC as *Amicus Curiae* 22–30.

No doubt this efficient scheme is well intended. But can there be any doubt that it also represents a retreat from the promise of judicial independence? Or that when an independent Judiciary gives ground to bureaucrats in the adjudication of cases, the losers will often prove the unpopular and vulnerable? Powerful interests are capable of amassing armies of lobbyists and lawyers to influence (and even capture) politically accountable bureaucracies. But what about everyone else?

Of course, all this invites the question: how do we know which cases independent judges must hear? The Constitution's original public meaning supplies the key, for the Constitution cannot secure the people's liberty any less today than it did the day it was ratified. The relevant constitutional provision, Article III, explains that the federal "judicial Power" is vested in independent judges. As originally understood, the judicial power extended to "suit[s] at the common law, or in equity, or admiralty."

*Murray's Lessee* v. *Hoboken Land & Improvement Co.*, 18
How. 272, 284 (1856). From this and as we've recently
explained, it follows that, "[w]hen a suit is made of the
stuff of the traditional actions at common law tried by the
courts at Westminster in 1789 . . . and is brought within
the bounds of federal jurisdiction, the responsibility for
deciding that suit rests with" Article III judges endowed
with the protections for their independence the framers
thought so important. *Stern* v. *Marshall*, 564 U. S. 462,
484 (2011) (internal quotation marks omitted). The Court
does not quarrel with this test. See *ante*, at 12–14. We
part ways only on its application.[1]

As I read the historical record presented to us, only
courts could hear patent challenges in England at the time
of the founding. If facts were in dispute, the matter first
had to proceed in the law courts. See, *e.g.*, *Newsham* v.
*Gray*, 2 Atk. 286, 26 Eng. Rep. 575 (Ch. 1742). If success-
ful there, a challenger then had to obtain a writ of *scire
facias* in the law side of the Court of Chancery. See, *e.g.*,
Pfander, Jurisdiction-Stripping and the Supreme Court's
Power To Supervise Inferior Tribunals, 78 Texas L. Rev.
1433, 1446, n. 53 (2000); Lemley, Why Do Juries Decide If
Patents Are Valid? 99 Va. L. Rev. 1673, 1686–1687 (2013)
(Lemley, Juries). The last time an executive body (the
King's Privy Council) invalidated an invention patent on
an ordinary application was in 1746, in *Darby* v. *Betton*,
PC2/99, pp. 358–359; and the last time the Privy Council

_____

[1] Some of our concurring colleagues see it differently. See *ante*, at 1
(BREYER, J., concurring). They point to language in *Commodity Futures
Trading Comm'n* v. *Schor*, 478 U. S. 833 (1986), promoting the notion
that the political branches may "depart from the requirements of
Article III" when the benefits outweigh the costs. *Id.,* at 851. Color me
skeptical. The very point of our written Constitution was to prevent
the government from "depart[ing]" from its protections for the people
and their liberty just because someone later happens to think the costs
outweigh the benefits. See *United States* v. *Stevens*, 559 U. S. 460, 470
(2010).

even *considered* doing so was in 1753, in *Baker* v. *James*, PC2/103, pp. 320–321. After *Baker* v. *James*, the Privy Council "divest[ed] itself of its functions" in ordinary patent disputes, Hulme, Privy Council Law and Practice of Letters Patent for Invention from the Restoration to 1794 (Pt. II), 33 L. Q. Rev. 180, 194 (1917), which "thereafter [were] adjudicated solely by the law courts, as opposed to the [crown's] prerogative courts," Mossoff, Rethinking the Development of Patents: An Intellectual History, 1550–1800, 52 Hastings L. J. 1255, 1286–1287 (2001) (Mossoff, Rethinking Patents).[2]

This shift to courts paralleled a shift in thinking. Patents began as little more than feudal favors. *Id.,* at 1261. The crown both issued and revoked them. Lemley, Juries 1680–1681. And they often permitted the lucky recipient the exclusive right to do very ordinary things, like operate a toll bridge or run a tavern. *Ibid.* But by the 18th century, inventors were busy in Britain and invention patents came to be seen in a different light. They came to be viewed not as endowing accidental and anticompetitive monopolies on the fortunate few but as a procompetitive means to secure to individuals the fruits of their labor and ingenuity; encourage others to emulate them; and promote

––––––––

[2] See also Brief for H. Tomás Gómez-Arostegui et al. as *Amici Curiae* 6–37; Brief for Alliacense Limited LLC as *Amicus Curiae* 10–11; Gómez-Arostegui & Bottomley, Privy Council and Scire Facias 1700–1883, p. 2 (Nov. 6, 2017) (Addendum), https://ssrn.com/ abstract=3054989 (all Internet materials as last visited Apr. 20, 2018); Observations on the Utility of Patents, and on the Sentiments of Lord Kenyon Respecting That Subject 23 (2d ed. 1791) ("If persons of the same trade find themselves aggrieved by Patents taken for any thing already in use, their remedy is at hand. It is by a writ of *Scire Facias*"); *Mancius* v. *Lawton*, 10 Johns. 23, 24 (NY Sup. Ct. 1813) (Kent, C. J.) (noting the "settled English course" that "[l]etters-patent . . . can only be avoided in chancery, by a writ of *scire facias* sued out on the part of the government, or by some individual prosecuting in its name" (emphasis deleted)).

public access to new technologies that would not otherwise exist. Mossoff, Rethinking Patents 1288–1289. The Constitution itself reflects this new thinking, authorizing the issuance of patents precisely because of their contribution to the "Progress of Science and useful Arts." Art. I, §8, cl. 8. "In essence, there was a change in perception—from viewing a patent as a contract between the crown and the patentee to viewing it as a 'social contract' between the patentee and society." Waltersheid, The Early Evolution of the United States Patent Law: Antecedents (Part 3), 77 J. Pat. & T. Off. Soc. 771, 793 (1995). And as invention patents came to be seen so differently, it is no surprise courts came to treat them more solicitously.[3]

Unable to dispute that judges alone resolved virtually all patent challenges by the time of the founding, the Court points to three English cases that represent the Privy Council's dying gasp in this area: *Board of Ordnance* v. *Wilkinson*, PC2/123 (1779); *Grill [Grice]* v. *Waters*, PC2/127 (1782); and *Board of Ordnance* v. *Parr*, PC1/3919 (1810).[4] Filed in 1779, 1782, and 1810, each involved an

_____

[3] See also, *e.g.,* Mossoff, Who Cares What Thomas Jefferson Thought About Patents? Reevaluating the Patent "Privilege" in Historical Context, 92 Cornell L. Rev. 953, 967–968 (2007) (Mossoff, Reevaluating the Patent Privilege) ("[A]n American patent in the late eighteenth century was radically different from the royal monopoly privilege dispensed by Queen Elizabeth or King James in the early seventeenth century. Patents no longer created, and sheltered from competition, manufacturing monopolies—they secured the exclusive control of an inventor over his novel and useful scientific or mechanical invention" (footnote omitted)); Mossoff, Rethinking Patents 1286–1287; H. Fox, Monopolies and Patents: A Study of the History and Future of the Patent Monopoly 4 (1947).

[4] The 1794 petition the Court invokes, *ante,* at 13, involved a Scottish patent. *Simpson* v. *Cunningham*, PC2/141, p. 88 (1794). The English and Scottish patents systems, however, were distinct and enforced by different regimes. Gómez-Arostegui, Patent and Copyright Exhaustion in England Circa 1800, pp. 10–16, 37, 49–50 (Feb. 9, 2017), https://ssrn.com/abstract=2905847. Besides, even in that case the

effort to override a patent on munitions during wartime, no doubt in an effort to increase their supply. But even then appealing to the Privy Council was seen as a last resort. The 1779 petition (the last Privy Council revocation ever) came only after the patentee twice refused instructions to litigate the patent's validity in a court of law. Gómez-Arostegui & Bottomley, Privy Council and *Scire Facias* 1700–1883, p. 6 (Nov. 6, 2017) https://ssrn.com/abstract=3054989 (citing *Board of Ordnance* v. *Wilkinson*, PC2/123 (1779), and PC1/11/150 (1779)). The Council did not act on the 1782 petition but instead referred it to the Attorney General where it appears to have been abandoned. Gómez-Arostegui & Bottomley, Privy Council and *Scire Facias, supra*, at 17–18. Meanwhile, in response to the 1810 petition the Attorney General admitted that *scire facias* was the "usual manner" of revoking a patent and so directed the petitioner to proceed at law even as he suggested the Privy Council might be available in the event of a "very pressing and imminent" danger to the public. *Id.,* at 20 (citing PC1/3919 (1810)).

In the end, these cases do very little to support the Court's holding. At most, they suggest that the Privy Council might have possessed some residual power to revoke patents to address wartime necessities. Equally, they might serve only as more unfortunate evidence of the maxim that in time of war, the laws fall silent.[5] But

––––––––

Scottish Lord Advocate "'was of opinion, that the question should be tried in a court of law.'" Gómez-Arostegui & Bottomley, Addendum, *supra*, at 23 (citing Petition of William Cunningham, p. 5, *Cunningham* v. *Simpson*, Signet Library Edinburgh, Session Papers 207:3 (Ct. Sess. Feb. 23, 1796)).

[5] After all, the English statute of monopolies appeared to require the "force and validitie" of all patents to be determined only by "the Comon Lawes of this Realme & not otherwise." 21 Jac. 1, c. 3, §2 (1624). So the Privy Council cases on which the Court relies may not reflect the best understanding of the British constitution.

whatever they do, these cases do not come close to proving that patent disputes were routinely permitted to proceed outside a court of law.

Any lingering doubt about English law is resolved for me by looking to our own. While the Court is correct that the Constitution's Patent Clause "'was written against the backdrop'" of English practice, *ante,* at 14 (quoting *Graham* v. *John Deere Co. of Kansas City*, 383 U. S. 1, 5 (1966)), it's also true that the Clause sought to *reject* some of early English practice. Reflecting the growing sentiment that patents shouldn't be used for anticompetitive monopolies over "goods or businesses which had long before been enjoyed by the public," the framers wrote the Clause to protect only procompetitive invention patents that are the product of hard work and insight and "add to the sum of useful knowledge." *Id.*, at 5–6. In light of the Patent Clause's restrictions on this score, courts took the view that when the federal government "grants a patent the grantee is entitled to it *as a matter of right*, and does not receive it, as was originally supposed to be the case in England, as a matter of grace and favor." *James* v. *Campbell*, 104 U. S. 356, 358 (1882) (emphasis added). As Chief Justice Marshall explained, courts treated American invention patents as recognizing an "inchoate property" that exists "from the moment of invention." *Evans* v. *Jordan*, 8 F. Cas. 872, 873 (No. 4,564) (CC Va. 1813). American patent holders thus were thought to "hol[d] a property in [their] invention[s] by as good a title as the farmer holds his farm and flock." *Hovey* v. *Henry*, 12 F. Cas. 603, 604 (No. 6,742) (CC Mass. 1846) (Woodbury, J.). And just as with farm and flock, it was widely accepted that the government could divest patent owners of their rights only through proceedings before independent judges.

This view held firm for most of our history. In fact, from the time it established the American patent system in 1790 until about 1980, Congress left the job of invalidating

patents at the federal level to courts alone. The only apparent exception to this rule cited to us was a 4 year period when *foreign* patentees had to "work" or commercialize their patents or risk having them revoked. Hovenkamp, The Emergence of Classical American Patent Law, 58 Ariz. L. Rev. 263, 283–284 (2016). And the fact that for almost 200 years "earlier Congresses avoided use of [a] highly attractive"—and surely more efficient— means for extinguishing patents should serve as good "reason to believe that the power was thought not to exist" at the time of the founding. *Printz* v. *United States*, 521 U. S. 898, 905 (1997).

One more episode still underscores the point. When the Executive sought to claim the right to cancel a patent in the 1800s, this Court firmly rebuffed the effort. The Court explained:

> "It has been settled by repeated decisions of this court that when a patent has [been issued by] the Patent Office, it has passed beyond the control and jurisdiction of that office, and is not subject to be revoked or cancelled by the President, or any other officer of the Government. It has become the property of the patentee, and as such is entitled to the same legal protection as other property." *McCormick Harvesting Machine Co.* v. *Aultman*, 169 U. S. 606, 608–609 (1898) (citations omitted).

As a result, the Court held, "[t]he only authority competent to set a patent aside, or to annul it, or to correct it for any reason whatever, is vested in the courts of the United States, and not in the department which issued the patent." *Id.*, at 609.

The Court today replies that *McCormick* sought only to interpret certain statutes then in force, not the Constitution. *Ante*, at 11, and n. 3. But this much is hard to see. Allowing the Executive to withdraw a patent, *McCormick*

said, "would be to deprive the applicant of his property without due process of law, and would be in fact an invasion of the judicial branch of the government by the executive." 169 U. S., at 612. *McCormick* also pointed to "repeated decisions" in similar cases that themselves do not seem to rest merely on statutory grounds. See *id.*, at 608– 609 (citing *United States* v. *Schurz*, 102 U. S. 378 (1880), and *United States* v. *American Bell Telephone Co.*, 128 U. S. 315 (1888)). And *McCormick* equated invention patents with land patents. 169 U. S., at 609. That is significant because, while the Executive has always dispensed public lands to homesteaders and other private persons, it has never been constitutionally empowered to withdraw land patents from their recipients (or their successors-in-interest) except through a "judgment of a court." *United States* v. *Stone*, 2 Wall. 525, 535 (1865); *Wellness Int'l Network, Ltd.* v. *Sharif*, 575 U. S. ___, ___ (2015) (THOMAS, J., dissenting) (slip op., at 11) ("Although Congress could authorize executive agencies to dispose of public rights in lands—often by means of adjudicating a claimant's qualifications for a land grant under a statute—the United States had to go to the courts if it wished to revoke a patent" (emphasis deleted)).

With so much in the relevant history and precedent against it, the Court invites us to look elsewhere. Instead of focusing on the revocation of patents, it asks us to abstract the level of our inquiry and focus on their issuance. Because the job of issuing invention patents traditionally belonged to the Executive, the Court proceeds to argue, the job of revoking them can be left there too. *Ante,* at 6– 10. But that doesn't follow. Just because you give a gift doesn't mean you forever enjoy the right to reclaim it. And, as we've seen, just because the Executive could *issue* an invention (or land) patent did not mean the Executive could *revoke* it. To reward those who had proven the social utility of their work (and to induce others to follow suit),

the law long afforded patent holders more protection than that against the threat of governmental intrusion and dispossession. The law requires us to honor those historical rights, not diminish them.

Still, the Court asks us to look away in yet another direction. At the founding, the Court notes, the Executive could sometimes both dispense and revoke public franchises. And because, it says, invention patents are a species of public franchises, the Court argues the Executive should be allowed to dispense and revoke them too. *Ante*, at 9–10. But labels aside, by the time of the founding the law treated patents protected by the Patent Clause quite differently from ordinary public franchises. Many public franchises amounted to little more than favors resembling the original royal patents the framers expressly refused to protect in the Patent Clause. The Court points to a good example: the state-granted exclusive right to operate a toll bridge. *Ante,* at 9. By the founding, courts in this country (as in England) had come to view anticompetitive monopolies like that with disfavor, narrowly construing the rights they conferred. See *Proprietors of Charles River Bridge* v. *Proprietors of Warren Bridge*, 11 Pet. 420, 544 (1837). By contrast, courts routinely applied to invention patents protected by the Patent Clause the "liberal common sense construction" that applies to other instruments creating private property rights, like land deeds. *Davis* v. *Palmer*, 7 F. Cas. 154, 158 (No. 3,645) (CC Va. 1827) (Marshall, C. J.); see also Mossoff, Reevaluating the Patent Privilege 990 (listing more differences in treatment). As Justice Story explained, invention patents protected by the Patent Clause were "not to be treated as mere monopolies odious in the eyes of the law, and therefore not to be favored." *Ames* v. *Howard*, 1 F. Cas. 755, 756 (No. 326) (CC Mass. 1833). For precisely these reasons and as we've seen, the law traditionally treated patents issued under the Patent Clause very differently than

monopoly franchises when it came to governmental inva-
sions. Patents alone required independent judges. Nor
can simply invoking a mismatched label obscure that fact.
The people's historic rights to have independent judges
decide their disputes with the government should not be a
"constitutional Maginot Line, easily circumvented" by
such "simpl[e] maneuver[s]." *Bank Markazi* v. *Peterson*,
578 U. S. \_\_\_, \_\_\_ (2016) (ROBERTS, C. J., dissenting) (slip
op., at 12).

Today's decision may not represent a rout but it at least
signals a retreat from Article III's guarantees. Ceding to
the political branches ground they wish to take in the
name of efficient government may seem like an act of
judicial restraint. But enforcing Article III isn't about
protecting judicial authority for its own sake. It's about
ensuring the people today and tomorrow enjoy no fewer
rights against governmental intrusion than those who
came before. And the loss of the right to an independent
judge is never a small thing. It's for that reason Hamilton
warned the judiciary to take "all possible care . . . to de-
fend itself against" intrusions by the other branches. The
Federalist No. 78, at 466. It's for that reason I respectfully
dissent.