# FIRST DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

_____

No. 1D2022-3433

_____

ERICA MCDONALD, as parent
and natural guardian of J.M., a
minor,

     Appellant,

     v.

FLORIDA BIRTH-RELATED
NEUROLOGICAL INJURY
COMPENSATION ASSOCIATION,
and FLORIDA HEALTH SCIENCES
CENTER, INC. d/b/a TAMPA
GENERAL HOSPITAL; and
UNIVERSITY OF SOUTH FLORIDA
BOARD OF TRUSTEES,

     Appellees.

_____


On appeal from the Division of Administrative Hearings.
J. Bruce Culpepper, Administrative Law Judge.

November 20, 2024


LEWIS, J.

Appellant, Erica McDonald, appeals a final order in which the administrative law judge ("ALJ") determined that her claim filed under Florida's Birth-Related Neurological Injury Compensation Plan ("NICA Plan" or "Plan") was compensable but time-barred

under section 766.313, Florida Statutes (2015), and that Appellees, Florida Health Sciences Center, Inc. d/b/a Tampa General Hospital ("Tampa General") and the University of South Florida Board of Trustees ("USF"), provided her with adequate notice of their participation in the Plan. This court has jurisdiction. *See* § 766.311(1), Fla. Stat. For the following reasons, the final order is affirmed.

*Factual Background*

In November 2020, Appellant filed a petition seeking NICA benefits with the Division of Administrative Hearings. She claimed that her child, who was born in September 2015 at Tampa General, suffered brain damage as a result of a birth-related neurological injury. After the hospital and USF intervened in the proceeding, NICA requested that the ALJ enter a summary final order finding that while Appellant's claim was compensable, it was time-barred and that, as a result, dismissal with prejudice was appropriate. The ALJ agreed that Appellant's claim was compensable under the NICA Plan but time-barred pursuant to section 766.313 and explained in part:

> Before compensation may be awarded under the NICA Plan, in addition to section 766.309(1), the ALJ must determine in section 766.316 whether:
>
>> Each hospital with a participating physician on its staff and each participating physician, other than residents, assistant residents, and interns deemed to be participating physicians under s. 766.314(4)(c), under the [NICA] Plan shall provide notice to the obstetrical patients as to the limited no-fault alternative for birth-related neurological injuries.
>
> At this time, the factual questions in section 766.316 remain to be determined, as well as their ramifications on Petitioner's rights and remedies with respect to [the child's] injury. *See Univ. of Miami v. Exposito ex rel. Gonzalez*, 87 So. 3d 803, 811 (Fla. 3d DCA 2012). . . .

2

In their subsequent motion for partial summary final order, Tampa General and USF argued that the notice they provided to Appellant of their participation in the NICA Plan met the statutory requirements of section 766.316. They relied upon a Notice to Obstetric Patients that Appellant electronically signed in May 2015 when she presented to the hospital for an ultrasound and again signed in September 2015 prior to the induction of labor. That notice provided:

> I acknowledge that I have received a copy of the brochure prepared by NICA entitled "Peace of Mind for an Unexpected Problem", which explains the limited no-fault alternative for birth-related neurological injuries provided by Florida Law. I have been advised that Tampa General Hospital participates in this program. This program (NICA) provides certain limited compensation in the event that specific neurological injuries occur during labor, delivery, or resuscitation. I understand that it is my responsibility to read the brochure and contact NICA if I have any questions.

Appellant also received a second notice on each of those visits, which provided in part as follows:

> I have been furnished information in the form of a brochure prepared by the Florida Birth-Related Neurological Injury Compensation Association (NICA), pursuant to Section 766.316, Florida Statutes, by the physicians[] of the University of South Florida Department of Obstetrics and Gynecology (USF OB/GYN). I have been informed and understand that ALL physicians currently or later employed with the USF OB/GYN Department, including but not limited to all of the individual physicians and certified nurse midwives named below, are participating physicians in the NICA Plan. In addition, I have been informed and understand that all of the USF OB/GYN resident physicians are participants in the NICA.

It is undisputed that Dr. Brown, the physician who delivered Appellant's child, was employed by USF when Appellant's child was born, but she was not expressly listed on the USF notice.

During the evidentiary hearing on the "notice issue," Tampa General's manager of patient access and patient financial services testified that Appellant was provided with the "NICA Peace of Mind" brochure in May and September 2015 and Appellant signed the electronic form confirming receipt of the brochure. The manager explained that although the signed notice form is uploaded into a patient's medical records, the brochure, which Tampa General obtained through NICA, is not kept in a patient's medical records. Tampa General's patient access specialist testified that she personally provided the brochure and notice forms to Appellant.

In the final order, the ALJ explained that the "sole (remaining) issue to be determined in this matter is whether Intervenors, Tampa General and USF/Dr. Brown, complied with the NICA notice requirements set forth in section 766.316. . . ." The ALJ found the testimony of Tampa General's witnesses to be credible and concluded that Appellant received adequate notice of Appellees' participation in NICA. As to the issue of whether Dr. Brown had to be personally named in the notice forms, the ALJ reasoned that the "ALL physicians" language contained in the forms provided Appellant with sufficient information to discern that Dr. Brown was a NICA participant. In support of this determination, the ALJ relied in part upon the Fifth District's opinion in *Jackson v. Florida Birth-Related Neurological*, 932 So. 2d 1125 (Fla. 5th DCA 2006), where the Fifth District upheld the ALJ's conclusion that notice was sufficient because a nurse for the medical group verbally advised the patient that "all of the physicians in [the practice group] participate in the NICA plan." As to the issue of whether Dr. Brown had an obligation to personally provide Appellant with notice of her NICA participation, the ALJ concluded that the approach USF used to inform Appellant of Dr. Brown's participation in NICA met the requirements of section 766.316. The ALJ further determined that Appellees were entitled to the rebuttable presumption that their notices were sufficient because of Appellant's written acknowledgement that she received the brochures. In finding that

4

Appellant did not overcome the presumption, the ALJ explained that she did not submit any evidence or testimony showing that the NICA brochures she received failed to include a clear and concise explanation of her rights under NICA. The ALJ concluded that both Tampa General and USF were entitled to invoke NICA as Appellant's exclusive remedy for her child's injuries and reiterated that the claim was compensable but time-barred. This appeal followed.

*Analysis*

NICA was established in 1988 by the Florida Legislature as a way to alleviate the high costs of medical malpractice insurance for obstetricians. *Fla. Birth-Related Neurological Injury Comp. Ass'n v. Dep't of Admin. Hearings*, 29 So. 3d 992, 994 (Fla. 2010). The Legislature created the NICA fund to provide compensation on a no-fault basis for birth-related neurological injuries. *Id.* If a claim qualifies as a "birth-related neurological injury," a claimant's exclusive remedy for compensation is through NICA. *Univ. of Miami v. Exposito ex rel. Gonzalez*, 87 So. 3d 803, 806 (Fla. 3d DCA 2012). Specifically, section 766.303(2), Florida Statutes (2015), provides in part:

> The rights and remedies granted by this plan on account of a birth-related neurological injury **shall exclude all other rights and remedies** of such infant, her or his personal representative, parents, . . . at common law or otherwise, against any person or entity directly involved with the labor, delivery, or immediate postdelivery resuscitation during which such injury occurs. . . . "[1]

---

[1] The statute provides an exception to the exclusivity provision when it states that "a civil action shall not be foreclosed where there is clear and convincing evidence of bad faith or malicious purpose or willful and wanton disregard of human rights, safety, or property, provided that such suit is filed prior to and in lieu of payment of an award under ss. 766.301-766.316."

(Emphasis added). The ALJ has "exclusive jurisdiction to determine whether a claim filed under NICA is compensable." §§ 766.301(1)(d), 766.304, and 766.311(1), Fla. Stat. (2015).

Because NICA remedies are limited, obstetric patients are entitled to receive pre-delivery notice of their rights and limitations under the Plan. *Id.* Section 766.316, Florida Statutes (2015), which is entitled "Notice to obstetrical patients of participation in the plan," provides:

> **Each hospital with a participating physician on its staff and each participating physician**, other than residents, assistant residents, and interns deemed to be participating physicians under s. 766.314(4)(c), under the Florida Birth-Related Neurological Injury Compensation Plan **shall provide notice to the obstetrical patients as to the limited no-fault alternative for birth-related neurological injuries**. **Such notice shall be provided on forms furnished by the association and shall include a clear and concise explanation of a patient's rights and limitations under the plan. The hospital or the participating physician may elect to have the patient sign a form acknowledging receipt of the notice form. Signature of the patient acknowledging receipt of the notice form raises a rebuttable presumption that the notice requirements of this section have been met**. Notice need not be given to a patient when the patient has an emergency medical condition as defined in s. 395.002(8)(b) or when notice is not practicable.

(Emphasis added). As the Florida Supreme Court has explained, "[T]o claim immunity from civil suits under NICA, health care providers must provide the required notice to patients." *Fla. Birth-Related Neurological Injury Comp. Ass'n*, 29 So. 3d at 995; *see also Jackson v. Florida Birth-Related Neurological*, 932 So. 2d 1125, 1127 (Fla. 5th DCA 2006) ("The purpose of the pre-delivery notice requirement is to enable the patient to make an informed choice between hiring an obstetrician who participates in the NICA plan and hiring one who does not. **Importantly, the failure of a physician to give the statutory pre-delivery notice to a**

6

**patient operates to preclude application of NICA's exclusive remedy provision, thereby entitling the patient to proceed with a medical malpractice lawsuit against the physician for damages arising out of the birth of a child with birth-related neurological injuries**.") (Emphasis added).

Pursuant to section 766.309(1)(d), Florida Statutes (2015), ALJs "ha[ve] the exclusive jurisdiction" to make "factual determinations regarding the notice requirements in s. 766.316." The ALJ in this case appropriately ruled on the issue of notice after determining that Appellant's claim was compensable though time-barred because if Appellees provided Appellant sufficient notice of their participation in NICA, then Appellant's exclusive remedy was through NICA. Appellant's failure to file a timely NICA claim would not render her eligible for damages in a civil suit for her child's injuries. Instead, if Appellees provided sufficient notice, they could claim NICA immunity in any civil suit Appellant may file against them. In contrast, if Appellees failed to provide sufficient notice to Appellant, then they would be unable to invoke NICA as Appellant's exclusive remedy for the child's birth-related neurological injuries in a subsequent civil suit.[2] *See Fla. Birth-Related Neurological Injury Comp. Ass'n*, 29 So. 3d at 999 (explaining that only those entities who give proper and timely notice of NICA participation are "shield[ed] from civil liability"); *see also Jackson*, 932 So. 2d at 1127. This is precisely why the notice issue is pivotal to the parties' case.

The only issues Appellant raises on appeal are that the ALJ erred in concluding that Dr. Brown complied with section 766.316's requirement that she notify Appellant of her participation in NICA and in determining that Appellant did not overcome the rebuttable presumption provided for in section 766.316 because she failed to show that the notice she was given was insufficient. An ALJ's interpretation of the NICA Plan is reviewed de novo. *Schur v. Fla. Birth-Related Neurological*, 832 So. 2d 188, 191 (Fla. 1st DCA 2002). An ALJ's factual findings are reviewed on appeal to

---

[2] Importantly, neither side disputes these points on appeal.

determine whether they are supported by competent, substantial evidence. *J.S. v. C.M.*, 135 So. 3d 312, 315 (Fla. 1st DCA 2012).

According to Appellant, USF's "purported" notices were insufficient because they did not list Dr. Brown as one of its NICA participating physicians. In rejecting this argument, the ALJ properly focused upon the language in the notice that read, "I have been informed and understand that ALL physicians currently or later employed with the USF OB/GYN Department, including but not limited to all of the individual physicians and certified nurse midwives named below, are participating physicians in the NICA Plan." By signing this notice, Appellant acknowledged that any USF physician, Dr. Brown included, participated in NICA.

The ALJ was also correct in finding that the Fifth District's decision in *Jackson* supported his conclusion. There, the appellants argued that the attending physicians and the medical group that employed them were not entitled to NICA immunity because they failed to give Mrs. Jackson proper pre-delivery notice of their participation in the NICA Plan. 932 So. 2d at 1128. The parties stipulated that the appellants' claim was compensable under NICA and that the only issue to be resolved was whether adequate notice had been given. *Id.* At the hearing, a nurse with the medical group testified that she informs prenatal patients about the NICA Plan by giving them a packet that includes a peace of mind pamphlet and that she verbally advises all prenatal patients that all of the physicians in the medical group participate in NICA. *Id.* at 1128. Mrs. Jackson was also given a Notice to Obstetric Patient form, which she signed. *Id.* The form had a blank space "where the individual names of [the medical group's] OB-GYN physicians were supposed to have been filled in." *Id.* The ALJ determined that because of the blank space, "the notice form was inadequate to give rise to the statutory rebuttable presumption that [the medical group] provided proper notice." *Id.* at 1128–29. He concluded, however, that Mrs. Jackson was informed during her visit that "the physicians associated with [the medical group's] obstetrical program were participating physicians in the [NICA] Plan." *Id.* at 1129. In affirming, the Fifth District reasoned that "[c]ontrary to the Jacksons' claim of error, there is no requirement that the names of the participating physicians be set forth in a written notice." *Id.*

8

Appellant argues that this court should decline to follow *Jackson* for two reasons, one of them being that it conflicts with the plain language of section 766.316 that "each participating physician" provide notice to patients. Yet, a patient would have the same opportunity to choose a non-NICA participating physician after being told that all of a medical group's physicians are NICA participants as she would if she were separately informed by each of the group's physicians that he or she participated in the Plan.

Appellant also argues that *Jackson* conflicts with the Florida Supreme Court's subsequent decision in *Florida Birth-Related Neurological Injury Compensation Association*, in which the court answered in the negative the certified question of whether "a physician's predelivery notice to his or her patient of the [NICA] plan and his or her participation in the plan satisfy the notice requirements of section 766.316 . . . if the hospital where the delivery takes place fails to provide notice of any kind." 29 So. 3d at 994. The court held that "in order to satisfy the notice requirements of section 766.316, Florida Statutes (1997), both participating physicians and hospitals with participating physicians on staff must provide obstetrical patients with notice of their participation in the plan." *Id.* at 994–95.

As Appellees contend, Appellant's reliance upon *Florida Birth-Related Neurological Injury Compensation Association* is misplaced. The supreme court in that case did not address the issue of whether a catch-all phrase is sufficient under section 766.316 to notify patients of all of a medical group's physicians' participation in the Plan. Nor did it address Appellant's other argument that one institution may not give a NICA notice on behalf of another institution's physicians. The only issue addressed in that case was whether a physician's notification excuses a hospital from providing its own notice of NICA participation. As the supreme court determined, that is clearly not permitted under section 766.316. In this case, USF provided Appellant with notice that all of its physicians were NICA participants. By virtue of Dr. Brown's employment with USF in September 2015, that notice met the statutory requirements of section 766.316. *Cf. Schur*, 832 So. 2d at 192 ("Dr. Boyd was required to provide notice of her participation [in NICA] . . . .

9

Although Dr. Boyd later became an employee of North Florida OB/GYN, at the time of [the child's] birth, she was employed by Beaches OB/GYN and did not fall under the North Florida OB/GYN umbrella.").

Appellant's arguments that USF's notice was insufficient because Tampa General's employees provided it to her or that Dr. Brown should have personally provided notice to her are meritless. There is no language in section 766.316 requiring a physician to personally notify a patient of his or her NICA participation. As previously noted, a nurse's notification of a medical group's physicians' NICA participation to the patient was deemed sufficient in *Jackson*. *See* 932 So. 2d at 1129. Nor is there any language prohibiting notice from being provided to a patient by the employees of one entity on behalf of another entity. *Cf. Univ. of Miami v. Ruiz*, 916 So. 2d 865, 867 (Fla. 3d DCA 2005) ("However, the hospital's NICA Plan notice did not indicate that it was also given on behalf of any physician associated with the hospital or that any physician in the hospital was a NICA Plan participant. Therefore, the ALJ correctly found that the hospital's notice was inadequate to satisfy the University physicians' independent obligation to provide notice."). Here, Tampa General's witnesses testified that Appellant was twice provided with a NICA notice on behalf of USF. This constituted sufficient notice under section 766.316.

Lastly, appellant argues that she overcame the rebuttable presumption provided for in section 766.316 by showing that the notice she was given was insufficient. Although, as the ALJ observed, the NICA brochure Appellant received was not a part of Appellant's medical records or admitted into evidence by Appellees, Tampa General's employees testified that they provided Appellant with the brochure, a fact which Appellant acknowledged. They also testified that the brochure Tampa General gives to patients comes from NICA itself. The NICA brochure has been deemed to satisfy the legislative mandate of providing a "clear and concise explanation of a patient's rights . . . and limitations . . . under the plan." *See Dianderas v. Fla. Birth Related Neurological,* 973 So. 2d 523, 527 (Fla. 5th DCA 2007).

10

Accordingly, the ALJ's final order is affirmed.[3]

AFFIRMED.

OSTERHAUS, C.J., concurs in result with opinion; TANENBAUM, J., dissents with opinion.

———————————————

***Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.***

———————————————

OSTERHAUS, C.J., concurring in result.

I concur with Judge Lewis's decision to affirm here. The administrative law judge rejected Appellant's claim under the Birth-Related Neurological Injury Compensation Plan, § 766.301, Fla. Stat. *et seq.,* because it was filed too late and was time-barred. But Appellant also raised the notice issue, which the statute allowed her to do. § 766.309(1), Fla. Stat. (requiring that the "[ALJ] shall make the following determinations based upon all available evidence: . . . (d) Whether, if raised by the claimant or other party, the factual determinations regarding the notice requirements in s. 766.316 are satisfied."). In turn, the ALJ issued a straightforward order concluding that "Petitioner's Petition is time-barred pursuant to section 766.313 but is otherwise compensable under the NICA Plan." This is an appealable "final order on compensability and notice" that Appellant had an explicit statutory right to appeal. § 766.309(4), Fla. Stat.; *see also*

---

[3] Had this court found that Appellees' notice was insufficient and reversed on that basis, Appellant would have been entitled to proceed with a medical malpractice action against them for damages resulting from her child's birth-related neurological injuries, and Appellees would have been unable to invoke NICA as Appellant's exclusive remedy. *See Fla. Birth-Related Neurological Injury Comp. Ass'n*, 29 So. 3d at 994; *Jackson*, 932 So. 2d at 1127.

§ 766.311, Fla. Stat. ("Review of an order of the [ALJ] shall be by appeal to the District Court of Appeal"). For this reason, I see no jurisdiction-related problem with our decision to affirm here versus dismissing. Indeed, article V, § 4(b), of the Florida Constitution provides explicitly that "[d]istrict courts of appeal shall have jurisdiction to hear appeals, that may be taken as a matter of right from . . . orders . . ., including those entered on review of administrative action. *See also* Art. V, § (4)(c) ("District courts of appeal shall have the power of direct review of administrative action, as prescribed by general law.").

On the merits, Appellant asked us to reverse based upon a substantively peripheral notice-requirement issue. *See* § 766.316, Fla. Stat. (requiring notice to patients of participation in the Plan). But the notice issue provides no basis for reversing the ALJ's disposition because Appellant's claim is time-barred. *See* § 766.313, Fla. Stat. (establishing a five-year limitation on claim). Otherwise, I concur with Judge Lewis's conclusion on the notice issue.

Finally, I agree with Judge Tanenbaum's observation at this juncture that nothing stops Appellant from filing an action in circuit court. *See* § 766.304, Fla. Stat. ("No civil action may be brought until the [compensability] determinations under s. 766.309 have been made by the administrative law judge."). But there, the circuit court is also free to reject such a civil case in view of the Plan's exclusivity of remedy scheme. *See* § 766.303, Fla. Stat. (establishing the Plan); *Fla. Birth-Related Neurological Injury Comp. Ass'n v. McKaughan*, 668 So. 2d 974, 976–79 (Fla. 1996) (discussing the exclusive remedy under the Plan as a jurisdictional bar to medical malpractice actions comparable to the workers compensation act); *cf., Mandico v. Taos Constr., Inc.*, 605 So. 2d 850, 853–54 (Fla. 1992) (recognizing the exclusive administrative process and remedy available under the workers' compensation law).

TANENBAUM, J., dissenting.

The "final agency action" we are asked to review is a "final order" of an administrative hearing officer within the executive branch, an order determining facts unrelated to the

compensability of Erica McDonald's claim for public funds on behalf of her daughter, who suffered severe injury during childbirth; facts instead related *only* to whether a circuit court would have jurisdiction to consider a future medical negligence suit likely to be brought by McDonald against healthcare providers involved with the daughter's delivery. The only function of the hearing officer in this context was to adjudicate McDonald's claim to a public right to compensation under a statutory plan established for injuries like that suffered by her child. Because the hearing officer previously had concluded (before this final order) that McDonald had no viable claim against the state treasury— the claim being time-barred—those determinations in the final order before us carry *zero* preclusive effect beyond the borders of the executive branch—by operation of both the Florida Constitution's express separation-of-powers requirement and the statutory scheme in play in this case.[1]

The final order having no legal consequence on McDonald's private rights (which can be adjudicated only by the exercise of judicial power vested in an actual court under Article V of the Florida Constitution), and McDonald not contesting the determination that her public right expired, the order on review has no adverse effect on McDonald that we would have authority

---

[1] On this point regarding lack of preclusive effect, Chief Judge Osterhaus appears to agree. In turn, Judge Lewis's statement that McDonald's "failure to file a timely NICA claim would not render her eligible for damages in a civil suit for her child's injuries" is not a binding part of the decision of this court. McDonald may bring her suit in circuit court; the providers may raise exclusivity as a defense; and McDonald may raise the notice question as an avoidance. The court at that point would have to resolve the defense and avoidance on the evidence presented—on its own if there is no dispute; through a jury if there is—unimpeded by the ALJ's determination as to notice, which could have no preclusive effect on the circuit court's exercise of independent judgment. It is this lack of preclusive effect—by operation of both our constitution and applicable statutes—that obviates our authority to act on the administrative order being appealed (either by affirming or setting aside) and provides the primary basis for my dissent.

to correct, even if we wanted to. In other words, McDonald's private rights will be just as intact regardless of whether we set it aside or modify it, making any opinion regarding notice advisory at best. Because there is no meaningful relief we could provide her on appeal—indeed, none is needed—giving any judicial imprimatur to the executive action before us would be merely an academic exercise, and we have no jurisdiction to engage in such a meaningless endeavor.[2] We should dismiss.

I

According to McDonald, her daughter suffered a "birth-related neurological injury" ("BRNI"), as defined in section 766.302(2), Florida Statutes. She sought reimbursement of medical expenses and payment of benefits out of a public fund the Legislature established for such injuries under the Florida Birth-Related Neurological Injury Compensation Plan (the "Plan"). *See* §§ 766.303, 766.31, 766.314, Fla. Stat. The fund being public, the Legislature waived sovereign immunity with respect to claims against it; but in doing so, the Legislature subjected this public right to certain conditions. § 766.303(3), Fla. Stat. (waiving immunity "solely to the extent necessary to assure payment of compensation"); *see generally Granfinanciera, S.A. v. Nordberg*,

_____

[2] My objection here goes to our jurisdiction—our authority to exercise judicial power at all in this appeal—so the parties' failure to put the matter in dispute is of no moment. *See Lovett v. Lovett*, 112 So. 768, 775 (Fla. 1927) (noting that subject matter jurisdiction "is the power conferred on the court by the sovereign—which means with us the Constitution or statute, or both—to take cognizance of the subject-matter of a litigation and the parties brought before it, and to hear and determine the issues and render judgment upon the issues joined" and that it is "universally recognized" that subject-matter jurisdiction "cannot be conferred by the acquiescence or consent of the parties"); *see also W. 132 Feet, etc., v. City of Orlando*, 86 So. 197, 198–99 (Fla. 1920) ("Courts are bound to take notice of the limits of their authority, and if want of jurisdiction appears at any stage of the proceeding, original or appellate, the court should notice the defect and enter an appropriate order.").

14

492 U.S. 33, 68 (1989) (Scalia, J., concurring) (defining public rights as "rights *of the public*—that is, rights pertaining to claims brought by or against" the government"); *cf. Ex parte Bakelite Corp.*, 279 U.S. 438, 452 (1929) ("Conspicuous among such matters are claims against the" government, and they "may arise in many ways and may be for money, lands, or other things."); *Stern v. Marshall*, 564 U.S. 462, 490–91 (2011) ("[W]hat makes a right 'public' rather than private is that the right is integrally related to particular [government] action."); *Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*, 584 U.S. 325, 334 (2018) (characterizing matters of public rights as those that "arise between the Government and persons subject to its authority in connection with the performance of the constitutional functions of the executive or legislative departments").

One of those legislative conditions for payment out of the fund is that an administrative law judge ("ALJ") assigned by the Division of Administrative Hearings ("DOAH")—an agency performing exclusively *quasi*-judicial functions within the executive branch[3]—must first determine that a claim under the Plan is compensable. *See* § 766.305(1), Fla. Stat. (requiring that claim for compensation under the Plan be filed with DOAH); § 766.304, Fla. Stat. (providing that the ALJ "has exclusive jurisdiction to determine whether a claim filed under this act is compensable"). In other words, McDonald would have no right to an award out of the Plan's fund unless an ALJ—rather than a court vested with judicial power under Article V—makes the determination regarding entitlement. *See* § 766.31(1), Fla. Stat. ("Upon determining that an infant has sustained a birth-related neurological injury and that obstetrical services were delivered by a participating physician at the birth, the administrative law judge shall make an award providing compensation. . . ."); *see also* § 766.309(4), Fla. Stat. (allowing ALJ to address compensability in one final order, subject to appeal, and to issue later an award under section 766.31, Florida Statutes).

---

[3] *See* Art. V, § 1, Fla. Const. ("Commissions established by law, or administrative officers or bodies may be granted quasi-judicial power in matters connected with the functions of their offices.").

15

There is nothing constitutionally infirm about this legislative choice on how a public right is to be administered. *Cf. McElrath v. United States*, 102 U.S. 426, 440 (1880) (noting that because the government is immune to suit, it "cannot be sued, except with its own consent," and in consenting, "[i]t can declare in what court it may be sued" and "restrict the jurisdiction of the court to a consideration of only certain classes of claims against" it); *Bakelite Corp.*, 279 U.S. at 451 (explaining how, when the legislative power waives sovereign immunity to allow for the determination of claims against the government, "[t]he mode of determining matters of this class is completely within [legislative] control," meaning the legislative power can "reserve to itself the power to decide, may delegate that power to executive officers, or may commit it to judicial tribunals"); *Oil States Energy Servs., LLC*, 584 U.S. at 334 (noting the "significant latitude" given by precedent to the legislative power "to assign adjudication of public rights to entities other than Article III courts").

Another condition the Legislature set on the public right to compensation from the Plan's fund is a requirement that a claim to that compensation be filed within five years of the injured child's birth. *See* § 766.313, Fla. Stat. ("Any claim for compensation under [the Plan] that is filed more than 5 years after the birth of an infant alleged to have a birth-related neurological injury shall be barred."). The association that administers the Plan—NICA[4]—responded that the claimed injury met the definition of BRNI but that the claim was not being accepted because it was time-barred. § 766.305(4), (7), Fla. Stat. (requiring NICA to respond to a claim and allowing NICA to accept "[a]ny claim which [it] determines to be compensable," subject to approval "by the administrative law judge to whom the claim for compensation is assigned"). On the question of the time-bar, NICA requested and received a summary final order ("SFO") from the ALJ assigned to McDonald's claim. *See* § 120.57(1)(h), Fla. Stat. (allowing a party to seek a "summary final order" in "a proceeding in which an administrative law judge has final order authority" if "there is no genuine issue as to any material fact" and allowing an ALJ to render such an order if "the

_____

[4] Formally named the "Florida Birth-Related Neurological Injury Compensation Association." § 766.315, Fla. Stat.

16

moving party is entitled as a matter of law to the entry of a final order"). The order determined that "the undisputed evidence indicates that [McDonald's] claim for NICA benefits was not timely filed," so her daughter "is barred from participation in the NICA Plan by the statute of limitations under section 716.313." McDonald does not challenge this final determination on appeal.

## II

Instead, McDonald appeals what came next from the ALJ, who did not stop with this dispositive determination as to compensability (*i.e.*, McDonald was not entitled to compensation for her daughter under the Plan). Even though the ALJ determined in a summary *final* order that compensation *may not* be awarded under the Plan (because it was time-barred), he explained that "[b]efore compensation may be awarded under the NICA Plan . . . the ALJ must determine" whether the notice required by section 766.316, Florida Statutes, was provided.[5] The ALJ suggested the "case posture" was such that "factual questions . . . remain to be determined" as to that notice, "as well as their ramifications on Petitioner's rights and remedies with respect to [the child's] injury." An evidentiary hearing ensued, followed by *another* final order from the ALJ, this one determining that both participating healthcare providers gave McDonald "adequate notice" in compliance with the "requirements of section 766.316." The disposition was (once again) that McDonald's claim "is time-barred," but that it was "*otherwise* compensable under the NICA Plan." (emphasis supplied).

Both the SFO and the later final order cite to *University of Miami v. Exposito ex rel. Gonzalez*, 87 So. 3d 803 (Fla. 3d DCA

---

[5] The notice healthcare providers are required to give patients under the Plan is to inform those patients "as to the limited no-fault alternative for birth-related neurological injuries." § 766.316, Fla. Stat.; *see also Galen of Fla., Inc. v. Braniff*, 696 So. 2d 308, 309–10 (Fla. 1997) ("[T]he purpose of the notice is to give an obstetrical patient an opportunity to make an informed choice between using a health care provider participating in the NICA plan or using a provider who is not a participant and thereby preserving her civil remedies.").

2012), ostensibly for the proposition that the ALJ's determination on the notice question—even though the claim was time-barred—nevertheless could prohibit McDonald from pursuing a civil negligence claim in Florida's circuit courts. That decision, as it turns out, does say the following:

> A claimant who files an untimely NICA claim does so at her own risk. Once the ALJ determines the claim is filed beyond five-year limitations period, the claimant is barred from pursuing a remedy under the NICA Plan. However, the ALJ must nonetheless reach and determine the second issue of compensability in order for the claimant to know whether she may still pursue a civil cause of action.
>
> If the ALJ determines that the claim, though untimely, is otherwise compensable, the claimant is not only prohibited from pursuing the NICA claim (time bar) but would also be prohibited from pursuing a civil action (because a finding of compensability renders a NICA claim the *exclusive* remedy for the claimant).

*Univ. of Miami v. Exposito ex rel. Gonzalez*, 87 So. 3d 803, 811 (Fla. 3d DCA 2012). The Third District gets it eminently wrong in these two paragraphs from *Exposito*; both misreading the relevant Plan statutory provisions *and* misunderstanding the limited reach of *quasi*-judicial power vis-à-vis that of the courts' *judicial* power.

A

Take the statutory provisions first. Section 766.309(1), Florida Statutes, indeed directs the ALJ to make "the following determinations based upon all available evidence:" a) whether the claimed injury meets the definition of BRNI; b) whether the delivering provider was a "participating physician" under the Plan; c) how much compensation is awardable, if any; and d) whether "the notice requirements in s. 766.316 are satisfied." At first glance, one might assume (as the Third District apparently did), that the statute tasks the ALJ with adjudicating certain facts in the place of a circuit court, regardless of whether there is a viable claim. But the first three determinations directly relate to whether the claimant is entitled to compensation from the Plan's fund in

18

the first place, and if so, how much; so they naturally mesh with the ALJ's core "function[] of [] office" within the executive branch, as assigned by the Legislature—gatekeeper of the Plan's fund—so the exercise of *quasi*-judicial power expected under this statutory provision is fine under the constitution. *See* Art. V, § 1, Fla. Const.; *cf.* § 766.31(1), Fla. Stat. ("Upon determining that an infant has sustained a birth-related neurological injury *and* that obstetrical services were delivered by a participating physician at the birth, the administrative law judge shall make an award providing compensation. . . ." (emphasis supplied)).

Now, if there is in fact an award from the Plan's fund based on an ALJ-determined entitlement to compensation—that is, if there is fulfillment of the claimant's public right—the fulfillment becomes the exclusive remedy, barring the claimant from subsequently filing a civil suit. *See* § 766.303(2), Fla. Stat. ("The rights and remedies granted by this plan on account of a birth-related neurological injury shall exclude all other rights and remedies . . . ."); § 766.304, Fla. Stat. ("If the administrative law judge determines that the claimant is entitled to compensation from the association, or if the claimant accepts an award issued under s. 766.31, no civil action may be brought or continued in violation of the exclusiveness of remedy provisions of s. 766.303."); *NICA v. DOAH*, 948 So. 2d 705, 711 (Fla. 2007) ("If the ALJ determines that a claim is compensable, compensation under the NICA Plan becomes the claimant's exclusive remedy."); *cf. Samples v. NICA*, 114 So. 3d 912, 921 (Fla. 2013) (holding that the "Plan as a whole . . . provides an alternative remedy to the uncertain and speculative compensation parents might receive through traditional tort remedies[,]" so it is a reasonable substitute for "a parent's right to access the courts for redress of their child's neurological birth-related injury"). This exclusivity is permissible as a trade-off condition for the public right established for the claimant by the Legislature: the statute then "shield[ing providers] from a civil tort action based upon the same claim." *NICA v. DOAH*, 948 So. 2d at 711.

For a provider to receive the benefit of this exclusivity, however, the notice requirements of section 766.316 must have been satisfied. *See id.* (explaining that compliance with the notice requirement of section 766.316 "is a condition precedent to NICA's

19

exclusivity"); *see also Galen of Fla., Inc. v. Braniff*, 696 So. 2d 308, 309 (Fla. 1997) (holding "that as a condition precedent to invoking the Florida Birth-Related Neurological Injury Compensation Plan as a patient's exclusive remedy, health care providers must, when practicable, give their obstetrical patients notice of their participation in the plan a reasonable time prior to delivery"). Enter the fourth determination the ALJ may make under section 766.309(1): whether "the notice requirements in s. 766.316 are satisfied." The ALJ—having determined the claimant *does have* a public right to compensation under the Plan—may, at the direction of the Legislature, adjudicate the factual question of notice—if raised—because the adjudication will affect the exclusivity of any award the ALJ then makes. *Cf. NICA v. DOAH*, 948 So. 2d at 716.

Again, the ALJ's conclusion that a claimant has a public right to compensation is a permissible exercise of *quasi*-judicial authority within the executive branch, and a determination of the extent of that right's effect and any conditions the Legislature has set for it—*e.g.*, whether it is an exclusive remedy—is folded into that same authority. *Cf. McElrath*, 102 U.S. at 440 ("If the claimant avails himself of the privilege thus granted, he must do so subject to the conditions annexed by the government to the exercise of the privilege."). If the ALJ determines the claimant is *not* entitled to compensation under the Plan, by contrast, the ALJ at that point has reached the limit of his authority to make fact determinations of any significance. Any additional factual determinations—including whether the proper notice was provided, like the ALJ tried to do here—constitutionally could have no effect outside the executive branch. The constitutional defect in the analysis set out by the Third District in *Exposito* is where I turn next.

B

As already explained, when the Legislature creates a public right or claim against the state treasury, it exercises its constitutional authority to waive sovereign immunity (under Article X, section 13 of the Florida Constitution), and in doing so, it has total control of "[t]he mode of determining matters of this class"; it can "reserve to itself the power to decide, may delegate that power to executive officers, or may commit it to judicial

tribunals." *Bakelite Corp.*, 279 U.S. at 451; *see also Oil States Energy Servs., LLC*, 584 U.S. at 334 (noting the "significant latitude" given by precedent to the legislative power "to assign adjudication of public rights to entities other than Article III courts"); Caleb Nelson, *Adjudication in the Political Branches*, 107 COLUM. L. REV. 559, 582 (2007). The same is not true with respect to a private right, like the right to sue in common-law tort for recovery of personal damages, which calls for the exercise of *judicial* power. *Cf. Wellness Intern. Network, Ltd. v. Sharif*, 575 U.S. 665, 711 (2015) (Thomas, J., dissenting) (describing the exercise of judicial power as the conclusive "[d]isposition of private rights to life, liberty, and property"); Nelson, *Adjudication in the Political Branches*, 107 COLUM. L. REV. at 567 (2007) (enumerating "three major groupings of core private rights," as "elaborated by William Blackstone" in his *Commentaries on the Laws of England* as "absolute" because men held them "merely as individuals" and not incidental to membership in society: "personal security," "personal liberty," and "private property").

Article V, section 1 of the Florida Constitution vests *judicial* power exclusively in the State's four types of courts—the supreme court, the district court of appeal, the circuit court, and the county court—and it allows only *quasi*-judicial power to be exercised from within the executive branch, but only with respect to an administrative entity's own internal functions. Only when a public right is being determined can an ALJ's fact-finding have any preclusive effect as to the parties. *Cf. Atlas Roofing Co., Inc. v. Occupational Safety & Health Rev. Comm'n*, 430 U.S. 442, 458 (1977) (explaining how administrative fact-finding can be binding on the parties "in only those situations involving 'public rights,' e.g., where the Government is involved in its sovereign capacity under an otherwise valid statute creating enforceable public rights"). Contrariwise, an ALJ's fact-finding *cannot* operate conclusively on a *private* right. *Cf. Stern*, 564 U.S. at 494 (describing the "prototypical exercise of judicial power" as "the entry of a final, binding judgment *by a court* with broad substantive jurisdiction, on a common law cause of action, when the action neither derives from nor depends upon any agency regulatory regime"); *cf. id.* at 484 (explaining that the U.S. Constitution's vesting of judicial power means that "Article III judges in Article III courts" (*i.e.*, "the Judiciary") have sole

responsibility and power to decide suits "made of the stuff of the traditional actions at common law tried by the courts at Westminster in 1789" (internal quotations and citations omitted)); *see* Nelson, *Adjudication in the Political Branches*, 107 COLUM. L. REV. at 577 (describing how, historically, when "only public rights were at stake and no private individual had yet acquired any vested right," there was no constitutional need for judicial power, and "Congress could authorize nonjudicial officers in the executive branch to make final and conclusive determinations").

The Legislature's provision for the ALJ's exercise of "exclusive jurisdiction to determine" both compensability of a claim and compliance with the Plan's notice requirements (*see* §§ 766.304, 766.309, Fla. Stat.) is its designation of an executive-branch tribunal and its exercise of *quasi*-judicial power (rather than a court and its exercise of *judicial* power) to adjudicate the existence of the Plan's *public* right. The Legislature cannot designate that same tribunal to conclusively adjudicate a *private* right, which would be the transfer of *judicial* power to an *executive* branch officer, something expressly foreclosed by the constitution. *See* Art. II, § 3, Fla. Const. (mandating a separation of powers); *see also* Art. I, § 22, Fla. Const. (preserving as "inviolate" the right to a jury trial); *cf. Den ex dem. Murray v. Hoboken Land & Imp. Co.*, 59 U.S. 272, 284 (1855) (explaining that the federal legislative power cannot "withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty"); *Crowell v. Benson*, 285 U.S. 22, 51 (1932) (describing a case "of private right" as one "of the liability of one individual to another under the law as defined"); *Granfinanciera, S.A.*, 492 U.S. at 51–52 (explaining that Congress "lacks the power to strip parties contesting matters of private right of their constitutional right to a trial by jury"). This understanding of the constitutional limit of an ALJ's authority explains the Legislature's provision for when "it is determined that a claim filed under this act *is not compensable*": the ALJ's determinations are not "admissible in any civil suit" and can have no preclusive effect (through either "collateral estoppel" or "res judicata") in the claimant's subsequent pursuit of "any and all civil remedies available under common law and statutory law." § 766.304, Fla. Stat. (emphasis supplied).

The ALJ in this case, relying on the legally unsustainable analysis in *Exposito*, incorrectly treated the time-bar on McDonald's claim as separate from the question of compensability—as if timeliness of a claim to a public right is not as integral to the viability of that claim as any other condition the Legislature imposes on that right. The plain meaning of "compensable," as used in the Plan's statutory provisions, refers to whether a claimant is entitled to payment on her claim: If one is not entitled to payment, the claim is not compensable. It so happens, as noted earlier, the Legislature conditioned the public right to compensation under the Plan, in part, on the filing of a claim within five years of birth. The determination in the SFO that McDonald failed to meet this condition also, in essence, was a determination that she no longer had a public right to compensation. In other words, her claim was "not compensable" because her public right expired.

It was unnecessary to then go forward with an evidentiary hearing to determine whether—holding aside the fact the claim already is time-barred—McDonald's claim was "otherwise compensable." At that point, there was no determination the ALJ could make of any legal consequence outside the executive branch. Putting the adverb "otherwise" before "compensable"—as the Third District did in *Exposito* to suggest there still was more for an ALJ to do—could not alter the conclusiveness of the ALJ's SFO, which already had determined the claim was time-barred. That literally is what "otherwise" means when used as a modifier in the manner used here—basically, to refer to a *different* set of circumstances than the one present before the ALJ, on which he determined that McDonald's claim was, in fact, *not compensable*.

Once the ALJ made that final determination that McDonald was not entitled to compensation, his statutory duty was at an end; the ALJ fully performed his function of office in administering claims against the fund under the Plan. The ALJ's fact-finding, across pages and pages, about how she *would have* had a viable claim had she filed earlier, and about how that claim *would have* been her exclusive remedy because the notice requirements were met is *advisory* (at best)—there no longer being a public right to determine. At all events, the ALJ's final order making this

hypothetical determination could have no legal effect on her private right to sue for damages.[6]

## III

We finally come to the question of this court's jurisdiction to review the ALJ's final order.

McDonald is left, potentially, with only a private right to relief at common law, and she is free to go to circuit court and invoke the State's *judicial* power to adjudicate that right. *See Mandico v. Taos Constr., Inc.*, 605 So. 2d 850, 854 (Fla. 1992) ("A person has a right to file a personal injury action in circuit court, and the court has jurisdiction to entertain the suit."); *id.* (explaining, in the context of the workers' compensation law, how the assertion that a plaintiff's exclusive remedy is through an administrative regime "is an affirmative defense, and its validity can only be determined in the course of litigation"); *Fla. Birth-Related Neurological Injury Comp. Ass'n v. McKaughan*, 668 So. 2d 974, 976, 979 (Fla. 1996) (characterizing affirmative defense of NICA exclusivity as a jurisdictional bar to medical malpractice action and applicability of *Mandico* to analysis).[7] Absent a public right on McDonald's part

---

[6] In a criminal case, we would not ask a jury to determine whether the defendant was "otherwise" guilty after it concluded the prosecution failed to prove an element of the charged offense. There likewise is no reason we would need to hear from an ALJ further regarding the Plan after he determines a claimant does not have a right to compensation under it.

[7] Pay no mind to the red flag added by the editors of Thomson Reuters to *McKaughan* as it appears in Westlaw. The editors explanation is that the decision has been "Superseded by Statute as Stated in *Florida Birth-Related Neurological Injury Compensation Ass'n v. Florida Div. of Administrative Hearings*, [948 So. 2d 705 (Fla. 2007).]" But the supreme court did not say this as part of any holding. The court instead simply quoted the Fifth District Court of Appeal's observation in *O'Leary v. Florida Birth-Related Neurological Injury Compensation Ass'n*, 757 So. 2d 624 (Fla. 5th DCA 2000) that the "amendments were made in response to this Court's decisions in *Florida Birth–Related Neurological Injury Compensation Ass'n v. McKaughan,* 668 So.2d

to be further adjudicated, nothing that the ALJ sets out in the final order can operate, as a legal matter, as an impediment on the circuit court's exercise of judicial power.

The ALJ had the authority to determine the extent of exclusivity behind the public right he already determined existed—because that determination would be tied to his executive function in administering awards of funds under the Plan—but he did not have the authority to adjudicate boundary-line facts—facts determinative of a private party's constitutional right or an Article V court's jurisdiction—regarding the ability of the circuit court to hear McDonald's suit in the absence of that public right, something exclusively within the province of the court itself. *See Mandico*, 605 So. 2d at 854 (noting, in the context of workers' compensation immunity (but, according to the supreme court, applicable in the NICA context as well) that "[t]he court has jurisdiction to decide the question [of exclusivity] even if it is wrong," and that "the decision will often turn upon the facts"); *see also English v. McCrary*, 348 So. 2d 293, 298 (Fla. 1977) (explaining how "[e]very court has judicial power to hear and determine the question of its own jurisdiction, both as to parties and as to subject matter" and its judgment on that fact will be conclusive unless set aside on direct appeal); *cf. Crowell v. Benson*, 285 U.S. 22, 64 (1932) (holding that "the essential independence of the exercise of the judicial power of the United States, in the enforcement of constitutional rights requires that the federal court should determine such an issue upon its own record and the facts elicited before it"); *id.* (noting that on a question of "constitutional

974 (Fla.1996), and *Galen of Florida, Inc. v. Braniff,* 696 So.2d 308 (Fla.1997)." *NICA v. DOAH*, 948 So. 2d at 712–13. Even so, both the Fifth District and the supreme court spoke of the amendments as applying to *claims* under the Plan. *See id.* at 713 ("Specifically, the Fifth District viewed the 1998 amendments as indicating the Legislature's intent to authorize the ALJ to make all determinations *regarding a claim under NICA*." (emphasis supplied)); *O'Leary*, 757 So. 2d at 627 ("The language used by the legislature in its amendment to the Act indicates that the administrative judge is to determine all matters relative to a claim."); *id.* at 628 ("We also note that a section 766.316 notice issue is peculiar to a NICA claim.").

25

authority of the deputy commissioner as an administrative agency, the court is under no obligation to give weight to his proceedings pending the determination of that question" and may instead make its own determination of the facts bearing thereon); *id.* at 61–62 (construing a statute authorizing the exercise of *quasi-*judicial power to allow for *non-final* determinations of "jurisdictional fact" to render it constitutional); *id.* at 60 (holding that there is an entitlement "to a judicial determination" by a trial court "of an essential jurisdictional fact both in the statutory and the constitutional sense" (internal quotations and citation omitted)).[8] There is no outsourcing by a trial court to an ALJ the jurisdictional question whether a private right has been extinguished.

Our authority as a district court of appeal to engage in judicial review of administrative action is limited to what general law provides. *See* Art. V, § 4(b)(2), Fla. Const. Even though, as the chief notes, section 766.311 authorizes direct review of an ALJ's order by appeal to a district court of appeal, for us to bring our appellate judicial power to bear on such an order, there nevertheless must be a "party who is adversely affected by" it. § 120.68(1)(a), Fla. Stat.; *see First Nat'l Bank v. Bebinger*, 128 So. 862, 863 (Fla. 1930) (describing that a "claim" necessitates "the existence of present or

---

[8] The only way the fact determinations made in the final order could hold any sway in circuit court at this point is if they were made by the ALJ operating as an adjunct of the trial court, akin to a special master. *See Stern*, 564 U.S. at 490 n.6 (observing that an administrative tribunal may make "narrowly confined factual determinations" on which private rights might turn as long as the determinations are subject to judicial review and enforceable "only by action of" a court exercising judicial power, such that the tribunal "functioned as a true 'adjunct' of the" trial court); *Atlas Roofing Co., Inc.*, 430 U.S. at 450 n.7 (observing that "[i]n cases which do involve only 'private rights,' this Court has accepted factfinding by an administrative agency, without intervention by a jury, only as an adjunct to an Art. III court, analogizing the agency to a jury or a special master"). There is no statutory or rule-based mechanism allowing for the ALJ to act in that capacity in this context.

possible adverse parties, whose contentions are submitted to the court" and that a court's judicial power is exercised over a claim in which it "is capable of acting upon" by determining "a controversy between parties wherein rights are enforced or protected or wrongs prevented or redressed"); *Sarasota-Fruitville Drainage Dist. v. Certain Lands Within Said Dist. Upon Which Drainage Taxes for the Year 1952 Have Not Been Paid*, 80 So. 2d 335, 336 (Fla. 1955) (noting that direct appellate review is available only for "actual controversies"); *cf. State v. J.P.*, 907 So. 2d 1101, 1113 n.4 (Fla. 2004) (noting that standing, at a "constitutional minimum," requires a concrete, actual or imminent "injury in fact" that can be remedied by the judicial relief sought). McDonald does not challenge the ALJ's determination that her claim was time-barred. And as has been explained in detail above, by operation of both the constitution and statute, the ALJ's determination about there being proper notice can have no effect—factually or legally—on her right to bring a suit in circuit court. There being no legally cognizable harm to McDonald's private rights stemming from the ALJ's final order—her cause of action unimpeded by the ALJ's order as a matter of law—there is no warrant for our exercise of judicial power to review that agency action, no remedy we could give to improve McDonald's position in circuit court.

\* \* \*

We lack jurisdiction and should dismiss. Even though there is a majority to affirm instead, McDonald should rest assured that the court's disposition still lends no legal force to the ALJ's otherwise advisory determination regarding notice, based on what Chief Judge Osterhaus and I separately have written in this case.

_____

Kara Rockenbach Link and Daniel M. Schwarz of Link & Rockenbach, PA, West Palm Beach; Carlos R. Diaz-Arguelles and Maria D. Tejedor of Diaz-Arguelles & Tejedor, P.A., Orlando, for Appellant.

Stephen A. Ecenia, J. Stephen Menton, and Tana D. Storey of Rutledge Ecenia, P.A, Tallahassee, for Appellee Florida Birth-Related Neurological Injury Compensation Association; Dinah S.

Stein and Aneta K. McCleary of Hicks, Porter, Ebenfeld & Stein, P.A., Miami; Mindy McLaughlin and Carissa Wheeler Brumby of Beytin, McLaughlin, McLaughlin, O'Hara & Bocchino, P.A., Tampa, for Appellee Tampa General Hospital; Jason M. Azzarone, Andrew Hudson, and Louis J. La Cava of La Cava, Jacobson & Goodis, P.A., Tampa, for Appellee/Intervenor University of South Florida Board of Trustees.